15 A.3d 431

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Donyell A. PADDY, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 14, 2008.

Decided March 30, 2011.

274

278

282

Shawn Nolan, for Donyell Paddy.

Hugh J. Burns Jr., Philadelphia District Attorney's Office, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

In this capital matter, Donyell A. Paddy (Appellant) appeals from the dismissal without a hearing of his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] As explained in detail *infra*, we affirm the PCRA court's order dismissing Appellant's claims, with the sole exception of one penalty phase claim that is rooted in trial counsel's investigation and presentation of mitigating evidence of Appellant's background and life history. With respect only to this one claim, we vacate the PCRA court's order and remand for an evidentiary hearing.

Appellant was convicted of first-degree murder and sentenced to death for the fatal shooting of Lashawn Whaley on April 28, 1993. Approximately two years before her murder, Ms. Whaley had identified Appellant as the perpetrator in a dual murder committed in 1991 (hereinafter the "Panati Playground murders"). The Commonwealth's theory of the instant case against Appellant was that he had murdered Ms. Whaley to prevent her from testifying against him during his trial for the Panati Playground murders.

Appellant's first trial for the murder of Ms. Whaley ended in a mistrial after the court concluded that the jury was hopelessly deadlocked. However, on December 18, 1995, following a second jury trial, Appellant was convicted of first-degree murder, criminal conspiracy, retaliation against a victim or witness, and possessing instruments of crime. A penalty phase hearing was held the next day, following which the jury found three aggravating and no mitigating circumstances and accordingly returned a sentence of death. The aggravating circumstances found by the jury were murder of a witness, knowing creation of a grave risk of death to another person in addition to the victim, and prior conviction for another murder.[2] Formal sentencing took place on May 29,

1. 42 Pa.C.S. §§ 9541–46.

2. Respectively, 42 Pa.C.S. §§ 9711(d)(5), (7), and (11).

1997. Appellant filed timely post-sentence motions, which were denied on December 17, 1998. The court appointed new counsel to represent Appellant on direct appeal, wherein he raised numerous claims of error, including ineffective assistance of trial counsel.[3] On July 8, 2002, this Court affirmed Appellant's judgment of sentence. *See Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294 (2002).

Appellant filed a *pro se* petition pursuant to the PCRA on September 20, 2002, and the court appointed counsel to represent him and ordered a stay of execution pending resolution of the petition. Appellant's first PCRA counsel was allowed to withdraw due to a conflict of interest, and the court appointed new counsel. However, because Appellant sought to represent himself, the PCRA court conducted a colloquy, and, on November 14, 2003, the court permitted Appellant to proceed *pro se* and appointed backup counsel. Appellant filed a second *pro se* PCRA petition and an amended *pro se* PCRA petition on, respectively, May 20, 2004, and November 17, 2004. The Commonwealth filed a motion to dismiss Appellant's petition, and on February 25, 2005, the PCRA court issued a notice of intent to dismiss the petition without a hearing, pursuant to Pennsylvania Rule of Criminal Procedure 907.[4] Around this same time, new counsel for Appellant appeared,[5] and requested a continuance to conduct investigation and make amendments to Appellant's PCRA petition. The PCRA court grant-

3. Appellant was represented at trial and sentencing by Janis Smarro, Esq.; on post-sentence motions by Daniel Preminger, Esq.; and on direct appeal by Jules Epstein, Esq. Because Appellant's direct appeal was concluded before this Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), Appellant was required to raise claims of ineffectiveness of trial counsel at the first stage in the proceedings at which he was represented by different counsel. *See Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 306 n. 5 (2002) (citing *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1323 n. 22 (1995)); *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 799 n. 1 (2007).

4. The PCRA court cited Rule 907 in its notice of intention to dismiss Appellant's petition. The more appropriate citation would have been Rule 909, which specifically addresses death penalty cases. The relevant provisions are identical in the two rules.

5. Specifically, Shawn Nolan, Esq., and Victor Abreu, Esq., of the Federal Capital Habeas Corpus Unit, and Michael Dodge, Esq., and Raymond Jamieson, Esq., of Quarles & Brady LLP, Milwaukee, WI.

ed counsel 60 days in which to respond to its notice of intent to dismiss. On April 26, 2005, counsel filed lengthy objections,[6] and on May 23, 2005, the PCRA court dismissed Appellant's petition without a hearing.

Appellant then filed a timely appeal to this Court.[7] The PCRA court ordered Appellant to file a statement of matters complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Appellant complied, and the PCRA court filed its opinion on March 10, 2006.[8] In his appeal, Appellant has raised multiple claims of error at the pre-trial, trial, penalty, and PCRA phases, most but not all of which are presented as allegations of ineffective assistance of counsel.[9]

6. This filing comprised 104 pages and was entitled "Petitioner's Objection to 907 Notice to Dismiss, Amendment to PCRA Petition and Memorandum of Law Requesting Habeas Corpus Relief under Article I, Section 14 of the Pennsylvania Constitution and for Statutory Post–Conviction Relief Pursuant to the Post–Conviction Relief Act."

7. This Court has jurisdiction over Appellant's appeal pursuant to 42 Pa.C.S. § 9546(d). *See Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945, 949 n. 1 (2008).

8. We note with disfavor that the PCRA court's opinion was cursory, devoting a total of less than six pages to resolution of Appellant's multiple issues, many of which were addressed with only one or two sentences.

9. Appellant's claims are reproduced verbatim below, reordered for ease of disposition:

1. Did the lower court err in dismissing Appellant's claim that counsel rendered ineffective assistance of counsel at trial?
2. Did the lower court err in dismissing Appellant's claim that his right to confrontation was violated when the trial court improperly excluded Appellant from an *in camera* hearing?
3. Did the lower court err in dismissing Appellant's claim that his confrontation and due process rights were violated when the Commonwealth's primary witness' preliminary hearing testimony was used to convict him?
4. Did the lower court err in dismissing Appellant's claim that he was deprived of effective assistance of counsel, a fair trial, and his right to confront witnesses, when trial counsel failed to secure the exclusion of inadmissible hearsay statements?
5. Did the lower court err in dismissing Appellant's claim that the trial court erroneously permitted the jury to hear evidence regarding Appellant's prior bad acts and erroneously instructed the jury that it could consider such evidence?

■■■ Under our standard of review for an appeal from the denial of PCRA relief, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 593 (2007). The PCRA court's credibility determinations are binding on this Court when they are supported by the record. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532, 539 (2009). However, this Court applies a *de novo*

6. Did the lower court err in dismissing Appellant's claim that the Commonwealth failed to reveal material, exculpatory evidence and offered materially false testimony and argument at trial?

7. Did the lower court err in dismissing Appellant's claim that the sentencing jury was improperly never instructed that, if sentenced to life, Appellant would be ineligible for parole.

8. Did the lower court err in dismissing Appellant's claim that court's instruction was erroneous and the evidence was insufficient to support the aggravating circumstance of the killing of a witness under 42 Pa.C.S. § 9711(d)(5)?

9. Did the lower court err in dismissing Appellant's claim that the trial court erroneously instructed that the jury must impose a sentence of death if it found that the mitigating circumstances outweighed the aggravating circumstances?

10. Did the lower court err in dismissing Appellant's claim that the trial court erroneously instructed that conduct "probably certain" to create a grave risk is sufficient evidence to establish an aggravating circumstance under § 9711(d)(7)?

11. Did the lower court err in dismissing Appellant's claim that the trial court erroneously instructed the jury that Appellant agreed to the existence of an aggravating circumstance?

12. Did the lower court err in dismissing Appellant's claim that the use of an unconstitutionally obtained prior conviction to aggravate Appellant's sentence in this case violated Appellant's rights?

13. Did the lower court err in dismissing Appellant's claim that the prosecutor engaged in numerous acts of misconduct during the penalty phase?

14. Did the lower court err in dismissing Appellant's claim that the trial court improperly restricted Appellant's penalty phase testimony?

15. Did the lower court err in dismissing Appellant's claim that counsel was ineffective for failing to adequately investigate, develop and present mitigating evidence, and object to erroneous instructions?

16. Did the lower court err in denying Appellant's Claims that Prior Counsel were Ineffective?

17. Did the lower court err in denying Appellant investigative and expert funds and time to investigate and present an amended counseled PCRA petition and in dismissing Appellant's claims without an evidentiary hearing?

standard of review to the PCRA court's legal conclusions. *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 810 (2007).

To be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a violation of the Pennsylvania or United States Constitution and ineffective assistance of counsel which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i), (ii). Furthermore, a petitioner must establish that the claims of error raised in the PCRA petition have not been previously litigated or waived and that "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S. § 9543(a)(3) and (4); *Washington, supra* at 593. An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

■ Under Pennsylvania Rule of Criminal Procedure 909, which governs PCRA petitions in capital cases, the PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court

Appellant's Brief at 1–2 (issues reordered).

otherwise abused its discretion in denying a hearing." *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 820 (2004).

To prevail in a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements, as set forth in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975–76 (1987): (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness. *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 954 (2008). With regard to the second, reasonable basis prong, "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." *Washington, supra* at 594. We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006) (citation omitted). To establish the third, prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. *Dennis, supra* at 954. We stress that boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective.

Because Appellant's direct appeal was decided prior to this Court's holding in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), and new counsel was appointed to represent Appellant on direct appeal, he was required to raise claims of ineffective assistance of trial counsel at that stage. *See supra* n. 3; *Paddy*, 800 A.2d at 306 n. 5; *Dennis, supra* at 954. Any claims of trial counsel ineffectiveness that Appellant failed to raise on direct appeal have been waived. *See Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 13 (2008); *Washington, supra* at 594 (citing 42 Pa.C.S. § 9544(b)). Appellant did, in fact, raise numerous claims of ineffective assis-

tance of trial counsel in his direct appeal. *See Paddy, supra* at 306–26. Several of the ineffectiveness claims raised in Appellant's PCRA petition are *identical* to the claims of ineffective assistance of trial counsel already addressed on direct appeal. These claims are not cognizable under the PCRA because they have been previously litigated. 42 Pa. C.S. § 9543(a)(3).

Of course, even under pre-*Grant* procedural dictates, claims of appellate counsel ineffectiveness were cognizable by the PCRA court, including claims of appellate counsel ineffectiveness for failure to raise claims of trial counsel ineffectiveness on direct appeal. *See Dennis, supra* at 954; *Washington, supra* at 595; *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 799 (2007) (citing *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1021 (2003)). To prevail on a claim of appellate counsel ineffectiveness for failure to raise an allegation of trial counsel ineffectiveness, a PCRA petitioner must present a "layered" claim, *i.e.,* he or she must present argument as to each of the three prongs of the *Pierce* test for each layer of allegedly ineffective representation. *Tedford, supra* at 13, 16; *Dennis, supra* at 954–55; *Washington, supra* at 595; *Rios, supra* at 800; *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 233 (2006) (citing *McGill, supra* at 1023). To establish the arguable merit prong of a claim of appellate counsel ineffectiveness for failure to raise a claim of trial counsel ineffectiveness, the petitioner must prove that trial counsel was ineffective under the three-prong *Pierce* standard. *Dennis, supra* at 954–55; *Washington, supra* at 595; *Rios, supra* at 800. If the petitioner cannot prove the underlying claim of trial counsel ineffectiveness, then petitioner's derivative claim of appellate counsel ineffectiveness of necessity must fail, and it is not necessary for the court to address the other two prongs of the *Pierce* test as applied to appellate counsel. *Rios, supra* at 800; *Carson, supra* at 233.

It is important to recognize that a claim of appellate counsel ineffectiveness for failing to raise a claim of trial counsel ineffectiveness is distinct from a claim of appellate

counsel ineffectiveness grounded in the manner in which appellate counsel litigated a claim of trial counsel ineffectiveness on appeal. *See Tedford, supra* at 16. In the former case, the claim of trial counsel ineffectiveness has been waived, but in the latter case, the claim of trial counsel ineffectiveness claims has been previously litigated.

> [This] distinction [between previously litigated and waived claims of trial counsel ineffectiveness] is important because, if a trial counsel ineffectiveness claim was already litigated, appellant must show that appellate counsel was ineffective in the manner in which he litigated the claim; and if the claim was waived, on the other hand, appellant must demonstrate that appellate counsel was ineffective for failing to raise the claim on direct appeal.

*Tedford, supra* at 16.

We turn now to Appellant's numerous issues, which we have divided into guilt phase, penalty phase, and PCRA claims.

## GUILT PHASE CLAIMS

■ In Appellant's first issue, he raises allegations of trial counsel ineffectiveness for the following: (A) failure to call numerous witnesses; (B) failure to investigate police corruption; (C) failure to avoid a conflict of interest with regard to an investigator working on both Appellant's and his co-defendant's cases; (D) failure to rebut allegedly contradictory testimony; and (E) failure to challenge forensic evidence. *See* Appellant's Brief at 11–25. Appellant also asserts, in general terms, that appellate counsel was ineffective for failing to raise the above claims of trial counsel ineffectiveness on direct appeal. *Id.* at 26. As discussed *supra*, Appellant has waived any claims of trial counsel ineffectiveness not raised on direct appeal, but claims of ineffective assistance of *appellate* counsel remain available to him on collateral review.

■ Before addressing Appellant's claims of ineffective assistance of appellate counsel for failing to raise specific claims of trial counsel ineffectiveness, we must note that several sub-claims of Issue 1(A) were in fact raised by appel-

late counsel on direct appeal and rejected by this Court on the merits. These previously litigated claims of ineffective assistance of trial counsel are the following: failure to call witnesses to impeach or rebut the preliminary hearing testimony of Shawn Roussaw, which was read into evidence at trial because he had died by the time of trial; and failure to call alibi witnesses to establish that Appellant did not commit the Panati Playground murders, thereby undermining the motive for killing the victim that had been advanced by the Commonwealth. *See Paddy*, 800 A.2d at 315–16. The only claim cognizable under the PCRA relative to these issues is a direct, stand-alone claim of ineffectiveness of appellate counsel grounded in the manner in which he litigated the claim on direct appeal. Appellant has provided not the slightest rationale or explanation for his assertion that appellate counsel's performance on direct appeal in litigating these claims of trial counsel ineffectiveness constituted ineffective assistance. Appellate counsel will not be deemed ineffective simply because the court declined to accept his arguments on behalf of a client. Accordingly, these claims of ineffective assistance of appellate counsel are waived for lack of development. *See Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 797 (2008) (stating that when an appellant fails "to set forth all three prongs of the ineffectiveness test and [to] meaningfully discuss them, he is not entitled to relief, and we are constrained to find such claims waived for lack of development").

We turn now to the remaining claims of trial counsel ineffectiveness in Issue 1, which were not raised on direct appeal. Although these claims have been waived, they underlie Appellant's cognizable, layered claims of appellate counsel ineffectiveness. As discussed *infra*, none of Appellant's claims of trial counsel ineffectiveness has any merit, and therefore, none of his derivative claims of appellate counsel ineffectiveness for failing to raise trial counsel ineffectiveness can succeed.

In Issue 1(A), Appellant contends that trial counsel was ineffective for failing to call witnesses who could have testified as to other potential killers of Ms. Whaley. The

"witnesses" on whom Appellant attempts to rely are Ms. Whaley's cousins, Beverly Wheeler and Anthony Wheeler, who claim in affidavits that Ms. Whaley had admitted to them that she had falsely implicated Appellant in the Panati Playground murders and that Ms. Whaley's boyfriend's family was concerned about her cooperation with the police. Contrary to Appellant's assertions, the affidavits do not implicate other individuals in the murder of Ms. Whaley. Merely stating that a family in the neighborhood was concerned because Ms. Whaley was talking to the police does not constitute evidence that some (unnamed) individual in that family murdered her. Any tie between Ms. Whaley's boyfriend's family and her murder was—and remains—pure speculation. Furthermore, as we pointed out on direct appeal, Appellant's guilt or innocence in the Panati Playground murders was not relevant to the instant case, and the Commonwealth introduced no evidence for the purpose of showing that Appellant had committed those earlier murders. *See Paddy, supra* at 314–15. Appellant has failed to show any arguable merit to his allegation that trial counsel was ineffective for failing to call these witnesses.

In Issue 1(B), Appellant claims that trial counsel was ineffective for failing to investigate police corruption and alleged police intimidation of Ms. Whaley. Contrary to Appellant's assertions, the record shows that trial counsel did indeed bring out the fact that one of the officers investigating the Panati Playground murders was subsequently indicted by federal prosecutors and that this officer had had contact with the victim regarding her knowledge of those earlier murders. Notes of Testimony ("N.T."), 12/4/95, at 95–99; 12/15/95, at 25–31 (defense summation). Appellant's allegations as to trial counsel's ineffectiveness for failing to conduct further investigations are entirely speculative and, accordingly, meritless.

In Issue 1(C), Appellant claims that trial counsel was ineffective for failing to avoid a conflict of interest in the hiring of a single private investigator to investigate the case for both Appellant and his co-defendant, Kevin Green. This

claim constitutes nothing more than an entirely speculative assertion. Appellant contends that a "conflict existed because evidence discovered by the investigator that **might have** exonerated Appellant **could have** been detrimental to Mr. Green." Appellant's Brief at 20 (emphasis added). Appellant provides no basis for this contention, nor any hint as to the nature of the postulated evidence. There is no arguable merit to Appellant's assertion of trial counsel ineffectiveness for failing to avoid an entirely speculative conflict of interest with respect to the private investigator.

In Issue 1(D), Appellant claims that trial counsel was ineffective for failing to rebut and to seek exclusion of the inconsistent and allegedly false preliminary hearing testimony of Shawn Roussaw. This claim is an amalgam of Issues 1(A) and 3, and it is discussed in the analysis of both of those issues.

Finally, in Issue 1(E), Appellant claims that trial counsel was ineffective for failing to challenge the adequacy of the crime scene investigation and other forensic evidence. Appellant faults trial counsel for failing to object to what Appellant characterizes as the "slovenly, incomplete, and substandard police investigation," and he suggests that the prosecution relied on "quasi-scientific inferences" and "departed from accepted scientific practices." Appellant's Brief at 22. Specifically, Appellant cites the following: (i) allegedly incomplete evaluation of a pair of blood-stained sunglasses with a broken lens recovered from the crime scene; (ii) alleged failure to recover other evidence from the crime scene or to take photographs; (iii) alleged failure to conduct an adequate investigation of the Pontiac Sunbird automobile that was used in Ms. Whaley's murder; (iv) allegedly sloppy and incomplete recovery of fingerprints from the automobile; (v) no DNA testing of cigarette butts recovered from the automobile; and (vi) alleged failure to challenge the Commonwealth's fiber expert. Our review of the record reveals that, with the exception of sub-issues (iv) (fingerprints) and (v) (DNA/cigarette butts), the above issue was not presented to the PCRA court at any time, in any form, not even in Appellant's lengthy

objections to the PCRA court's notice of intention to dismiss. Failure to raise an issue before the PCRA court results in waiver. *Commonwealth v. Natividad,* 595 Pa. 188, 938 A.2d 310, 322, 336 (2007).

With regard to sub-issue (iv) (the fingerprint evidence) and contrary to Appellant's assertions, counsel vigorously cross-examined the testifying officer and the fingerprint examiner and suggested weaknesses in and inconsistencies between their respective testimonies in her closing argument. *See* N.T., 12/8/95, at 78–84; 12/11/95, at 30–41; 12/15/95, at 39–40. Appellant fails to suggest what additional actions defense counsel could have or should have taken. Appellant's bald assertion that counsel might have shown the fingerprint results to be exculpatory is unexplained and baseless. *See* Appellant's Brief at 24. Accordingly, Appellant's allegation of trial counsel ineffectiveness with regard to the fingerprint evidence is meritless.

Similarly, with regard to sub-issue (v) (the cigarette butts found in the car), Appellant's contention that DNA testing could be exculpatory of Appellant is entirely untenable. A showing that the cigarette butts, which were discarded in the vehicle at some indeterminable time, did not contain Appellant's DNA, would not establish that Appellant was not in the vehicle used in Ms. Whaley's murder and would not be probative of Appellant's involvement, much less exculpatory. Appellant does not-and indeed cannot-make a convincing argument that DNA testing of the cigarette butts would be relevant to any material fact of this case. There is no merit to Appellant's argument of trial counsel ineffectiveness for failing to raise this sub-issue.

In sum, because Appellant cannot establish trial counsel ineffectiveness with regard to his Issue 1 claims, his derivative claims of appellate counsel ineffectiveness must likewise fail. Appellant is entitled to no relief on his first issue.

 In Appellant's second issue, he contends that his rights to confront a witness and to be represented by counsel were violated when, during the trial, the trial judge excluded

Appellant from an *in camera* hearing with witness Freddy Murphy. Appellant further asserts that trial counsel was ineffective for failing to object to Appellant's exclusion, and that appellate counsel was ineffective for failing to raise the issue on direct appeal. As explained under Issue 1, the only one of these claims of error not waived for failure to litigate it on direct appeal is the alleged ineffectiveness of appellate counsel. However, because Appellant's underlying claim of trial counsel ineffectiveness cannot succeed, his derivative claim of appellate counsel ineffectiveness likewise cannot succeed, as explained *infra*.[10]

Mr. Murphy was a witness for the prosecution who testified that he was involved in a conspiracy with Appellant and several other men to transport Ms. Whaley to Maryland in order to prevent her from testifying against Appellant at his trial for the Panati Playground murders. N.T., 12/4/95, at 43–90. On cross-examination, Murphy changed his story and stated that his direct examination testimony was partially untrue. *Id.* at 90–108. On redirect examination, his testimo-

---

10. The PCRA court summarily held that Appellant's second issue was both waived and meritless. PCRA Opinion, filed 3/10/06, at 10. The PCRA court did not conduct a waiver analysis, and apparently failed to recognize that a claim of appellate counsel ineffectiveness is distinct from an underlying claim of trial counsel ineffectiveness or trial court error. In fact, in its brief discussion of Issue 2, the PCRA court did not mention the *Pierce* test for ineffective assistance, nor apply it to any level of representation. In concluding that Issue 2 was meritless, the PCRA court merely pointed out that no testimony was taken from Mr. Murphy at the *in camera* conference, and that Appellant's counsel was present. The PCRA court also noted that Mr. Murphy had expressed fear of Appellant, who was on trial for the murder of a Commonwealth witness in another murder case. *Id.* The PCRA court did not engage in a thorough legal analysis, complete with supporting authority, of the merits of this claim. The PCRA court simply concluded that Appellant's "right to confront the witnesses against him was not violated." *Id.*

We disapprove of the PCRA court's cursory treatment of this issue. We recognize the burden placed upon the PCRA courts when presented with complex capital appeals challenging nearly every ruling and every action or inaction of counsel in every aspect of the petitioner's trial. However, once again, we must stress the need for developed, independent reasoning, as well as factual findings and legal conclusions, from the PCRA courts. *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1121–22 (2008).

ny was confused and contradictory. *Id.* at 109–35, 138–41. At the close of proceedings for the day, Mr. Murphy attempted to speak to the prosecutor and asked to see him.

The prosecutor then requested an *in camera* hearing, which the court held the following day in the presence of defense counsel and Mr. Murphy's counsel, but without Appellant. N.T., 12/5/95, at 28; 12/6/95, at 23–24, 36–38. Although trial counsel did not raise a formal objection to Appellant's absence, she did inquire about Appellant's right to be present. The trial court refused to allow Appellant to be present during the *in camera* proceeding because no testimony was to be offered against him. N.T., 12/5/95, at 27; *see* PCRA Court Opinion, dated 3/10/06, at 10. The trial court directed the record of the *in camera* proceeding to be sealed and ordered defense counsel not to discuss what had happened therein with her client. *Id.* at 44. It is clear that, even if defense counsel had raised a formal objection to Appellant's absence, it would have been denied. At the *in camera* proceeding, Mr. Murphy testified that he had lied on cross-examination because he was afraid of Appellant. *Id.* at 28–44; 12/6/95, at 14–39. The following day, Mr. Murphy testified again before the jury, returning to his initial direct examination testimony and admitting that on cross-examination he had said some things that were not true because he feared Appellant. N.T., 12/6/95, at 21, 39.

Under the Sixth Amendment to the United States Constitution, an accused has the right "to be confronted with the witnesses against him." "The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.*" *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (emphasis in original) (quoting 5 J. Wigmore, Evidences 1395, p. 123 (3d ed.1940)). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 679, 106 S.Ct. 1431 (citation omitted). The United States Supreme Court has further recognized that trial judges have considerable discretion to

place reasonable limits on cross-examination based on a variety of concerns, including a witness's safety. *Id.*

In the instant case, we cannot conclude that trial counsel was ineffective for failing to protect Appellant's right to confront witnesses against him when she did not formally object to Appellant's absence from the *in camera* proceeding. The trial court conducted the *in camera* proceeding only after Mr. Murphy gave conflicting and contradictory testimony on his first day on the witness stand and then sought to speak with the prosecutor. Following the *in camera* proceeding, Mr. Murphy again gave testimony before the jury, at which time he returned to his original story, which was not favorable to Appellant; admitted that he had not told the truth on cross-examination; and confirmed his fear of Appellant. These were the only issues that were addressed during the *in camera* proceeding. Appellant was present throughout Mr. Murphy's testimony before the jury, and he had the opportunity to cross-examine Mr. Murphy before and after the *in camera* proceeding. Appellant's counsel did, in fact, thoroughly and forcefully cross-examine Mr. Murphy before the jury. In deciding to hold an *in camera* proceeding, the trial court properly recognized that Appellant was on trial for *murdering a witness* who planned to testify against him at an earlier murder trial. Appellant was not denied his right to confront Mr. Murphy, either before or after the *in camera* proceeding, and we cannot conclude that there is arguable merit to Appellant's contention that trial counsel was ineffective for failing to formally object to Appellant's absence from the *in camera* proceeding.

Furthermore, there is not the slightest indication that Appellant was prejudiced by counsel's failure to formally object to his absence from the *in camera* hearing. Appellant raises only one claim of possible prejudice: he alleges that he was unable to confirm that Mr. Murphy was involved in the Scutching family drug organization, information that he contends would have assisted counsel during cross-examination of Mr. Murphy. This is a frivolous contention. Even if Mr. Murphy's alleged involvement with the Scutching family was

relevant (and Appellant fails to provide any evidence or argument that it was), there is no reason why Appellant could not have supplied such information to his counsel at any time. The Scutching family was not even mentioned during the *in camera* proceedings.

In sum, because trial counsel was not ineffective for failing to formally object to the trial court's decision to conduct the *in camera* proceeding without Appellant, Appellant cannot satisfy the arguable merit prong for his derivative claim of appellate counsel ineffectiveness; hence, Appellant cannot prevail on his second issue.

■ Next, in Issues 3 and 4, Appellant raises several claims of ineffective assistance of appellate counsel for failing to "properly" or "fully" litigate the following claims of trial counsel ineffectiveness on direct appeal: failing to object to the admission of the preliminary hearing testimony of Shawn Roussaw (Issue 3), and failing to object to the testimony of several witnesses regarding statements made to them by the victim in which she identified Appellant as the shooter in the Panati Playground murders and expressed her fear of him (Issue 4). Appellant's Brief at 27–30 (Issue 3) and 30–38 (Issue 4). Appellant raised identical allegations of trial counsel ineffectiveness on direct appeal, and this Court denied relief after review on the merits. *See Paddy, supra* at 308–14. The only claim cognizable under the PCRA with regard to these matters is a direct, stand-alone claim of ineffective assistance of appellate counsel, grounded in the manner in which appellate counsel litigated the claims on direct appeal.

However, Appellant utterly fails to set forth a direct claim of appellate counsel ineffectiveness. He merely states, summarily and with no explanation, that appellate counsel failed to raise the issues "properly" or "fully." Appellant's Brief at 30, 37. In addition, he unhelpfully offers that appellate counsel raised Issue 4 "incompletely and ineffectively." *Id.* at 38. He does not even mention—much less discuss—what specific acts or omissions of appellate counsel constituted the alleged ineffective assistance. We have absolutely no idea to what acts or

omissions Appellant refers when he states that "appellate counsel was ineffective for failing to properly litigate this claim" or that "appellate counsel could have had no reasonable basis for his failure to fully litigate this claim." *Id.* at 30. Such general assertions are unreviewable. Accordingly, Appellant's claims in Issues 3 and 4 are waived for lack of development. *See Steele*, 961 A.2d at 797.[11]

11. The PCRA court fashioned Issues 3 and 4 as claims of trial court error, and concluded that they had been previously litigated on direct appeal. PCRA Court Opinion at 7 and 9. This is not entirely correct because, as we discussed in connection with Issue 2, *see* n. 10, the PCRA court has again failed to recognize that a claim of appellate counsel ineffectiveness is distinct from an underlying claim of trial counsel ineffectiveness or trial court error.

On direct appeal, Appellant structured the claims in Issues 3 and 4 as claims of ineffective assistance of trial counsel for failing to object to admission of the testimony, and we held that that trial counsel was not ineffective in this regard. *Paddy*, 800 A.2d at 308–14. A claim of appellate counsel ineffectiveness related to the manner in which he raised and litigated on direct appeal the underlying claim of trial counsel ineffectiveness has not been previously litigated; indeed, Appellant's PCRA petition represented his first opportunity to raise such a claim.

Our precedent has made abundantly clear that a claim of ineffectiveness of counsel is distinct from the underlying claim of trial court error. *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 573 (2005) (holding that "a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under § 9544(a)(2) ... [and] a PCRA court should recognize ineffectiveness claims as distinct issues and review them under the three-prong ineffectiveness standard announced in [*Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987) ]").

Repeatedly, throughout its opinion, the PCRA court construes Appellant's claims of ineffective assistance of counsel as direct claims of trial court error, which are waived or previously litigated, and not cognizable under the PCRA. *See* PCRA Court Opinion at 7 and 9 (discussing Issues 3 and 4); 10 (discussing Issue 5, admission of "bad acts" evidence); 12 (discussing Issue 7, "life means life" instruction, and Issue 12, prior murder conviction as an aggravating factor);

Although most of the issues raised by Appellant are claims of ineffective assistance of counsel, the PCRA court opinion does not discuss or apply the *Pierce* standard by which ineffectiveness claims are analysed. When an ineffectiveness claim is grounded in an underlying allegation of trial court error, *e.g.*, in an ineffectiveness claim for failing to object to or to raise a claim of alleged trial court error, then application of the *Pierce* standard may certainly incorporate an analysis of the underlying allegation of trial court error. Nonetheless, it is essential that each issue be framed correctly by the PCRA court so that the proper standard is applied in resolving the issue.

In Appellant's fifth issue, he contends that the trial court erred in admitting evidence of Appellant's prior bad acts, specifically related to the Panati Playground murders, and allowing this evidence to "permeate" the trial. Appellant's Brief at 53. Appellant specifically refers to the testimony that he had conspired to send Ms. Whaley to Maryland at the time of his trial for the earlier murders and to pay her not to testify.[12] In addition, Appellant refers to evidence that he had fled from police several days *prior* to Ms. Whaley's murder, and contends that the trial court erred in its instruction concerning possible interpretations of this flight from the authorities because flight can not be interpreted as consciousness of guilt of a crime not yet committed. Finally, Appellant asserts that trial counsel was ineffective for failing to object to the testimony and the jury instruction, and that appellate counsel was ineffective for failing to raise these matters fully, properly, or effectively on direct appeal. Appellant's Brief at 57.

 The issues of trial counsel ineffectiveness presented in Issue 5 were already raised and rejected on the merits on direct appeal; hence, they have been previously litigated and are not cognizable under the PCRA.[13] *See Paddy*, 800 A.2d at 307–08 & n. 6 and 322–23. With regard to the claim of appellate counsel ineffectiveness, Appellant fails to make any argument as to how or why appellate counsel's performance was deficient in litigating these issues of trial counsel ineffectiveness on direct appeal. Accordingly, as discussed in detail under Issues 3 and 4, Issue 5 is waived for Appellant's failure to develop an argument to support his direct claim of appellate counsel ineffectiveness.

12. Also in Issue 5, Appellant raises again his claim that the evidence of Ms. Whaley's identification of him as the shooter in the Panati Playground murders was improperly admitted. This portion of Issue 5 is merely a repetition of Issue 4, and we have addressed it in the text *supra*. *See* discussion of Issues 3 and 4, *supra*.

13. To the extent that Issue 5 is raised as a direct claim of trial court error, it is waived. *See* 42 Pa.C.S. §§ 9543(a)(3), 9544(b).

In Appellant's sixth issue, he alleges that the Commonwealth failed to disclose exculpatory evidence in five instances, in violation of his constitutional right to due process as recognized in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant's Brief at 38–50. To establish a *Brady* violation, an appellant must prove three elements:

[1] the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

*Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 854 (2005) (citation omitted).

The evidence alleged to have been withheld by the prosecution must have been "**material** evidence that deprived the defendant of a fair trial." *Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563, 573 (2002) (emphasis added). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

*Brady* does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses." *Lambert, supra* at 856. Similarly, *Brady* does not require the prosecution to disclose "every fruitless lead" considered during the investigation of a crime. *Lambert, supra* at 857. *Brady* sets forth a limited duty, not a general rule of discovery for criminal cases. *Lambert, supra* at 854 (citing *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) for the proposition that "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one"); *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284, 297 (1998). The burden rests with Appellant to "prove,

by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 898 (1999). There is no *Brady* violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources. *Lambert, supra* at 856; *Paddy, supra* at 305.

■ In Appellant's first *Brady* claim, he contends that the prosecution improperly failed to disclose police reports of a kidnapping and assault in which Ms. Whaley's boyfriend, Ervin Scutching,[14] was a complainant. Notably, the reports were dated two years prior to Ms. Whaley's murder, they involved an incident that had no connection to her murder, and they did not even mention Ms. Whaley. Appellant focuses only on a statement in the reports to the effect that the police believed the complainants were members of the Junior Black Mafia. Appellant suggests that this statement conveyed the "[k]nowledge that the police were investigating drug dealers who had close relations to Lashawn Whaley." Appellant's Brief at 43. Accordingly, in Appellant's view, "[d]isclosure of these reports would have alerted trial counsel to the existence of an alternative theory as to who killed Lashawn Whaley and why." *Id.* at 42. Furthermore, Appellant continues, "without these reports, the Commonwealth was able to mislead the jury in a deceptive attempt to eliminate culpability of anyone other than Appellant." *Id.* at 43. Appellant's assertions are nothing short of nonsense.

As Appellant acknowledges, evidence was offered at trial that Ms. Whaley at times lived with Mr. Scutching above the store that his family operated. Appellant's Brief at 42; N.T., 11/30/95, at 110–11; 12/7/95, at 76–77, 95–96. Appellant's theory—for which there is no evidence—is that someone in the Scutching enterprise murdered Ms. Whaley because she was cooperating with the police. Even if we were to accept Appellant's contention that the police reports at issue suggest an active police investigation into drug-related activities of the

14. In the notes of testimony, the name of Ms. Whaley's boyfriend has been transcribed as "Irving Scutchin."

Scutching family, we fail to see how such information would constitute *Brady* material. It is well-established that *Brady* does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses," *Lambert, supra* at 856, and does not require the prosecution to disclose "every fruitless lead" considered during the investigation of a crime. *Id.* at 857. The police reports at issue are not material, not exculpatory, and certainly do not undermine confidence in the jury verdict.

In Appellant's second *Brady* claim, he contends that the prosecution failed to produce the car keys found by police during searches of Appellant's "various residences," which keys, according to Appellant, matched neither the vehicle used in Ms. Whaley's murder, nor the Ford Mustang in which Appellant had evaded the police some days prior to the murder. *See* Appellant's Brief at 43–44. Appellant insists that "[t]he fact that keys were recovered that did not connect Appellant to any of the vehicles in question was *Brady* material that should have been turned over to the defense." *Id.* at 44. This claim is totally frivolous. Even if all of Appellant's allegations with regard to the keys were true (which the Commonwealth disputes), this "evidence" would still be immaterial and, as the PCRA court concluded, not exculpatory. PCRA Court Opinion at 7. The Commonwealth's evidence established that the car used in the murder was driven not by Appellant, but by his co-defendant, Kevin Green, and was abandoned after the murder. N.T., 11/30/95, at 95–100; 12/7/95, at 65–66, 73, 75; 12/15/95, at 69–71 (defense closing argument). The Ford Mustang, which Appellant was seen driving several days prior to the murder when he evaded police, was shortly thereafter abandoned, and evidence was presented that it had been stolen. N.T., 11/30/95, at 56–61; 12/7/95, at 4–30. The fact that keys to neither of these abandoned vehicles were found in Appellant's residences is not relevant, much less exculpatory.

In Appellant's third *Brady* claim, he contends that the prosecution suppressed evidence of cigarette butts found in

the vehicle used in Ms. Whaley's murder, after discovering that Appellant did not smoke. Appellant insists that a police report turned over to his co-defendant listed the cigarette butts among the items found in the vehicle, but the police report provided to him did not, allegedly because it was missing a page. Appellant further contends that the Commonwealth offered false testimony at trial when Officer Wilfredo Aponte testified that nothing other than hair fibers was recovered from the vehicle, and did not mention the cigarette butts. Appellant insists that evidence of the cigarette butts could have been used to impeach Officer Aponte's testimony and thus to undermine his credibility. The Commonwealth disputes Appellant's contentions, pointing out that page 3 of Commonwealth Exhibit No. 59 (hereinafter "Exhibit C–59"), which included the police report provided to Appellant, describes the cigarette butts found in the car. *See* Commonwealth's Brief at 46 and n. 15. We agree with the PCRA court that the cigarette butts were not exculpatory. *See* PCRA Court Opinion at 8. Furthermore, the record does not support Appellant's assertion that the presence of the cigarette butts was suppressed by the Commonwealth.

In the certified record, Exhibit C–59 comprises four pages: an investigation report on form 75–49, consisting of three pages, and a property receipt on form 75–3, consisting of one page. Exhibit C–59 was offered into evidence at trial and was described at that time as a document consisting of a total of four pages (three pages in the investigation report and a single page property receipt). N.T., 12/8/95, at 58. Officer Aponte identified the investigation report at trial and expressly stated that the investigation report consisted of three pages. N.T., 12/8/95, at 59, 82. Page three of the investigation report lists the cigarette butts. Hence, the certified record and the notes of testimony completely belie Appellant's assertion that the Commonwealth failed to disclose the presence of cigarette butts in the vehicle used in the murder.

In Appellant's fourth *Brady* claim, he contends that the prosecution suppressed an interview with one Renee Mitchell, recorded by homicide detective David Baker. The

interview concerned the vehicle used in Ms. Whaley's murder, which police found on Ms. Mitchell's block. The document in question is not a statement by Ms. Mitchell or a recorded interview, but merely a single page interview record form containing only the following shorthand, hand-written notes, presumably by the detective, as to his discussion with Ms. Mitchell concerning the vehicle:

showed up 2 nights ago wi 2 guys in it, they left it,

Tomorrow at 11:00 am

P/S on Boyfriend

Investigation Interview Record of Renee Mitchell by Detective Baker, dated 4/28/93.

This vague document could not possibly be exculpatory of Appellant. Appellant attempts to bolster the significance of this document by including an affidavit by Renee Pullins, nee Renee Mitchell. Appellant asserts that Ms. Mitchell states in her affidavit that she saw Appellant's co-defendant, Kevin Green, get out of the car on her block two days before Ms. Whaley's murder, but she could not identify Appellant as the man who accompanied Kevin Green. *See* Appellant's Brief at 49. Appellant then asserts that this evidence is material and exculpatory. Appellant is wrong. Not only is Appellant's assertion as to who was in the vehicle days before Ms. Whaley's murder immaterial, it does not even accurately reflect Ms. Mitchell's sworn affidavit. Directly contrary to Appellant's assertion, Ms. Mitchell declares in her affidavit that she never saw Kevin Green in any car on her block and she never told police that she did. Renee Pullins Affidavit, dated 11/21/04. Appellant's "argument" as to his fourth *Brady* claim is a disjointed, often incoherent and irrelevant compilation of allegations that are not even consistently supported by the documents that he cites.

In Appellant's fifth and final *Brady* claim, he alleges that the prosecution suppressed evidence that one of its key witnesses, Freddy Murphy, received early parole in exchange for his testimony against Appellant. Appellant's Brief at 49. The record refutes Appellant's allegations. At trial, Mr. Murphy

testified that he was given immunity with respect to his involvement in relocating Ms. Whaley to keep her from testifying at Appellant's trial for the Panati Playground murders, and that he expected to receive probation in an open drug case, all in exchange for his testimony against Appellant. N.T., 12/4/95, at 103–04; 12/6/95, at 22, 27–28. Furthermore, Mr. Murphy's written agreement with the Commonwealth was introduced into evidence as Commonwealth Exhibit No. 25. *See* Memorandum of Agreement, dated 12/4/95 (labeled as Exhibit C–25); N.T., 12/4/95, at 90. Pursuant to this written agreement, the Commonwealth was to recommend to the court that Mr. Murphy be given probation for his open drug-related case. Memorandum of Agreement, dated 12/4/95, ¶¶ 8, 11. That defense counsel was well-aware of the specific terms of this agreement is made unmistakably clear by her cross-examination of Mr. Murphy at trial. *See* N.T., 12/6/95, at 22, 27–28. Thus, Appellant's final *Brady* claim is frivolous because it is based on misrepresentation of the record.

Because all of Appellant's issues regarding the guilt phase of his trial are meritless, as discussed *supra,* we affirm the PCRA court's dismissal of those issues that relate to the guilt phase. We now turn to Appellant's arguments of error pertaining to the penalty phase.

## PENALTY PHASE CLAIMS

In Appellant's seventh issue, the first of his penalty phase claims, he contends that trial counsel was ineffective for failing to request a jury instruction that a sentence of life imprisonment means life without the possibility of parole, and that appellate counsel was ineffective for failing to raise this issue on direct appeal. We have previously explained the background to such a claim as follows:

In *Simmons v. South Carolina,* 512 U.S. 154, [170, 114 S.Ct. 2187, 129 L.Ed.2d 133] (1994) (plurality), a plurality of the United States Supreme Court would have held that, if a prosecutor argues a capital defendant's future dangerousness at a sentencing trial, the defendant may request and

should be granted a jury instruction that a penalty of life in prison will render the defendant ineligible for parole. This Court has held that a *Simmons* instruction is mandated only if two events occur: (1) the prosecutor must place the defendant's future dangerousness in issue; and (2) the defendant must have requested that the trial court issue the instruction.

*Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 273 (2006) (citations omitted).

■ We have consistently held that reference merely to a defendant's history of violent felonies does not implicate future dangerousness and hence does not mandate a *Simmons* instruction. *Id.* at 273; *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1243 (2006). A defendant is not entitled to a *Simmons* instruction simply because a prosecutor presents argument for the applicability of the statutory aggravating factor of past violent felonies and hence of necessity focuses on the defendant's history of violent felony convictions. *Carson, supra* at 273; *Spotz, supra* at 1243; *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44, 47 (1998). For example, in *Carson,* we concluded that the following statement by the prosecutor did not warrant a *Simmons* instruction:

The third aggravating circumstance is that history of felony convictions[,] and when the legislature passed that [it was] saying to you and to me enough is enough. Mr. Carson, you had your chance. We are not going to let any more people be injured.

3 felonies, ladies[ ] and gentlemen, two of them came out of the same circumstance with guns, with knives. One of them a 14–year–old. Enough is enough.

*Carson, supra* at 273 (quoting from Notes of Testimony).

■ These precedents compel the conclusion that Appellant's trial counsel was not ineffective for failing to request a *Simmons* instruction. The prosecutor's comments of which Appellant complains all referred to Appellant's past acts. We agree with the PCRA court that the prosecution did not make Appellant's future dangerousness an issue. *See* PCRA Court

Opinion at 12. In Appellant's argument to the contrary, he cites portions of the following comment by the prosecutor during the penalty phase:

Where does it all end? He said that in 1991, he got religion after the murder of Little Man Thomas that he hadn't, at that time, been convicted of.[sic] Well, did he lose it again in 1993 when he brought his big gun and shot Lashawn's brains out? Yes. Where does it end? Does he have the right to ask you to do something that he didn't [ ] do[,] at least for two cases, listen to him, hear him and [spare] his life. Would he have heard Lashawn when she said "Don't shoot. . . .[?]

N.T., 12/18/95, at 71.

The prosecutor referred solely to Appellant's past violent conduct, urging the jury not to spare Appellant's life because he had not spared the life of his victim. Because future dangerousness was not raised, Appellant was not entitled to a *Simmons* instruction, and trial counsel was not ineffective for failing to request such an instruction. Because trial counsel was not ineffective, the arguable merit prong of the *Pierce* test for a derivative claim of appellate counsel ineffectiveness cannot be satisfied, and Appellant's seventh issue must fail.

In Appellant's eighth issue, he contends that trial counsel was ineffective for failing to object to the trial court's instruction regarding one of the aggravating factors put forth by the Commonwealth during the penalty phase, *i.e.*, the murder of a prosecution witness, and that appellate counsel was ineffective for failing to raise this issue on direct appeal. The statutory provision that sets forth this aggravating factor reads as follows:

The victim was a prosecution witness to a murder or other felony *committed by the defendant* and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

42 Pa.C.S. § 9711(d)(5) (emphasis added).

Appellant argues that the trial court wrongly instructed the jury that, under Section 9711(d)(5), the Commonwealth was

not required to prove that the defendant had actually committed the murders witnessed by the victim. *See* N.T., 12/18/95, at 91–92. Appellant has incorrectly interpreted our precedent.

In *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 952 (1982), this Court expressly rejected the argument that the phrase "committed by the defendant" in Section 9711(d)(5) "impose[d] upon the Commonwealth the additional burden of proving that the collateral 'murder or other felony' must have been *actually* committed by the defendant." *Id.* (emphasis in original); *accord Commonwealth v. Fisher*, 559 Pa. 558, 741 A.2d 1234, 1240–41 (1999). We explained this holding as follows:

> Such a burden would be unreasonable and frequently impossible of execution, because, by eliminating critical prosecution witnesses, a criminal defendant could make certain that the Commonwealth could not meet that burden. The criminal justice system receives a shocking jolt when a defendant flaunts the law enforcement authority of the Commonwealth by murdering a prosecution witness. The tremors felt throughout that system are extreme and are not diminished in cases where, *by that very act of murder*, the Commonwealth may be prevented from proving that the defendant actually committed the collateral crimes with which he was charged.

*Zettlemoyer, supra* at 952 (emphasis in original).

Relying on *Zettlemoyer*, we conclude that trial counsel was not ineffective for failing to object to the jury instruction concerning the aggravating factor set forth in Section 9711(d)(5) (murder of a prosecution witness). Because trial counsel was not ineffective, the arguable merit prong of the derivative claim of appellate counsel ineffectiveness cannot be satisfied, and Appellant's eighth issue must fail.

In Appellant's ninth and tenth issues, he challenges two additional portions of the trial court's instruction to the jury, specifically contending that trial counsel was ineffective for failing to object to the instructions concerning the weigh-

ing of aggravating circumstances against mitigating circumstances (Issue 9) and concerning the "grave risk" aggravating circumstance, 42 Pa.C.S. § 9711(d)(7), (Issue 10). Furthermore, he contends that appellate counsel was ineffective for failing to "fully develop" these issues on direct appeal. Appellant's Brief at 64, 69.

As the PCRA court concluded, these precise claims of alleged trial counsel ineffectiveness were raised on direct appeal and rejected; hence they are previously litigated. *See Paddy, supra* at 325–26; PCRA Court Opinion at 10–11. Although on direct appeal we concluded that there might be some merit to the claims, we also determined that Appellant had not been prejudiced by the errors, and we therefore declined to hold trial counsel ineffective. Our rationale for these holdings was based on the jury's penalty phase finding of three aggravating and no mitigating circumstances. Given such findings, weighing of aggravating and mitigating circumstances was not required, so a faulty instruction in that regard was of no significance. Furthermore, even if the "grave risk" aggravating circumstance were discounted based on the faulty instruction, two aggravating circumstances and no mitigating circumstances would remain as jury findings, necessitating a sentence of death. *See Paddy, supra* at 326; 42 Pa.C.S. § 9711(c)(1)(iv); *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 442 n. 10 (2006).

Appellant contends that our holdings were incorrect as a matter of federal constitutional law, and he argues that appellate counsel was ineffective for failing to "fully develop" the arguments concerning prejudice to Appellant based on constitutional principles.[15] Appellant's Brief at 61, 64, 68–69. For his constitutional argument, Appellant relies on the holding in *Sochor v. Florida,* 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), a capital case in which the United States Supreme

---

**15.** The PCRA court correctly concluded that the claims of trial counsel ineffectiveness in Issues 9 and 10 were previously litigated. PCRA Court Opinion at 10. However, the PCRA court did not seem to recognize that Appellant's claim of appellate counsel ineffectiveness grounded in the manner in which counsel litigated the issues of trial counsel ineffectiveness on direct appeal is a separate and distinct claim.

Court required a harmless error analysis after the Florida Supreme Court struck one aggravating factor, leaving three aggravating factors and no mitigating factors for the fact-finder to weigh. Based on *Sochor*, Appellant argues that, on direct appeal, this Court should have conducted a "constitutional harmless error analysis." Appellant's Brief at 61.

Appellant's reliance on *Sochor* is grounded in a misinterpretation of Florida law. Contrary to both Appellant's assertion, *see* Appellant's Brief at 62, and Pennsylvania law, Florida law does *not* require imposition of the sentence of death upon the finding of at least one aggravating circumstance and no mitigating circumstances. *See Darling v. State*, 966 So.2d 366, 385 (Fla.2007) ("This Court has repeatedly held that comments to the effect that if the aggravators outweigh the mitigators, a recommendation of a death sentence is mandatory, misstate the law."); *Henyard v. State*, 689 So.2d 239, 249–50 (Fla.1996) ("[A] jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors."). Thus, *Sochor* is not applicable to Appellant's case because of the substantial difference between Pennsylvania and Florida law. Furthermore, Appellant fails to acknowledge that the United States Supreme Court has considered and rejected a challenge based on the Eighth Amendment to the United States Constitution to that portion of the Pennsylvania Sentencing Code that requires a jury to impose a sentence of death if it finds at least one aggravating circumstance and no mitigating circumstances. *See Blystone v. Pennsylvania*, 494 U.S. 299, 305, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).

■■■ In Appellant's eleventh issue, he raises yet another challenge to the jury instruction regarding the grave risk aggravating circumstance in the context of an ineffective assistance claim. Specifically, Appellant contends that the trial court inaccurately implied that he had stipulated to the applicability of the grave risk aggravator, and he contends that trial counsel was ineffective for failing to object to this portion of the instruction, and appellate counsel was ineffective for failing to raise trial counsel's alleged ineffectiveness.

Even if we were to conclude that there is arguable merit to these assertions, we would deny relief on the same basis as described immediately above under Issues 9 and 10: Appellant has failed to show that he was prejudiced by counsel's alleged ineffectiveness because, if one aggravating circumstance were discounted, two aggravating and no mitigating circumstances would remain, and hence the jury would still have been required to impose the death penalty.

In Appellant's twelfth issue, he asserts that the trial court erred when it allowed the Commonwealth to introduce Appellant's conviction for the murder of Wilbur "Little Man" Thomas as an aggravating circumstance, pursuant to 42 Pa. C.S. § 9711(d)(11), because this conviction was "unconstitutional." Appellant's Brief at 86. Appellant cites his self-proclaimed innocence of this murder, his pending federal habeas corpus petition, and his full expectation of a new trial as support for his assertion of the unconstitutionality of this prior conviction. Appellant further asserts that trial, post-sentence motion, and direct appeal counsel were ineffective for failing "to properly raise and litigate this claim." Appellant's Brief at 87. There is no merit to Appellant's contentions.[16]

Appellant's underlying claim of trial court error ignores this Court's clear precedent, in which we have held that the term "conviction" means simply "found guilty" when used in the context of the aggravating circumstances set forth in 42 Pa.C.S. § 9711(d). *Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367, 376 (1985) (citing *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460, 464 (1984)). The fact that a collateral murder conviction is not final because it is at the post-verdict or appellate stage "does not divest said conviction of its character as an aggravating circumstance." *Id.* at 376. Only if the collateral murder conviction that constituted an aggravating circumstance is overturned on appeal could an error ensue. *Id.; Beasley, supra* at 464.

16. Appellant also inserts a claim of *Brady* violations, apparently in the context of his conviction for the murder of Mr. Thomas. To the extent that this claim is comprehensible, it is irrelevant.

At the penalty phase of Appellant's trial, the undisputed evidence established that, in May 1994, a jury convicted Appellant of first-degree murder in the death of Wilbur Thomas. Appellant was sentenced to life imprisonment for this offense. *See* N.T., 12/18/95, at 12–14.[17] The trial court properly allowed the Commonwealth to enter this prior conviction into evidence as an aggravating factor during the penalty phase. It is irrelevant that Appellant's federal *habeas corpus* petition challenging his conviction for this earlier murder is pending. Trial counsel was not ineffective for failing to object to the proper admission of this conviction into evidence, and hence Appellant's derivative claim of appellate counsel ineffectiveness cannot succeed.

In Appellant's thirteenth issue, he raises numerous allegations of prosecutorial misconduct during the penalty phase, followed by consolidated and summary assertions of trial counsel ineffectiveness for failing to object and appellate counsel ineffectiveness for failing to raise trial counsel ineffectiveness on appeal. The specific allegations of prosecutorial misconduct are the following: (A) improper cross-examination of Martha Paddy, Appellant's mother, with a "prior consistent statement;" (B) improper cross-examination of Appellant by insertion of the prosecutor's personal beliefs; (C) improper cross-examination of Maudi Fields, the mother of Appellant's sister's former boyfriend, with questions intended to inflame the passions of the jury; and (D) an improper closing argument designed to dehumanize Appellant by branding him an animal and also to inflame the passions of the jury.[18]

17. Appellant's judgment of sentence in the Wilbur Thomas case was affirmed by the Superior Court in a memorandum opinion, *Commonwealth v. Paddy*, 455 Pa.Super. 677, 687 A.2d 859 (1996) (Table), and this Court denied Appellants petition for allowance of appeal. *Commonwealth v. Paddy*, 547 Pa. 753, 692 A.2d 564 (1997).

18. The PCRA court does not address Issue 13, but merely and partially erroneously indicates that Appellant's contentions of prosecutorial misconduct were raised and rejected on direct appeal, and hence were previously litigated. PCRA Court Opinion at 10–11. As discussed in the text, *supra*, on direct appeal, Appellant raised two claims of trial counsel ineffectiveness for failing to object to statements by the prosecutor during the penalty phase. *See Paddy*, 800 A.2d at 324–25. No other aspect of Issue 13 was raised on direct appeal.

■ Appellant fails to acknowledge that two of these sub-issues (alleged ineffective assistance of trial counsel for failure to object to both the cross-examination of Appellant as well as the alleged branding of Appellant as an animal) were raised and rejected on direct appeal. *Paddy,* 800 A.2d at 324–25. Furthermore, Appellant does not set forth, as he must, an argument that appellate counsel was ineffective in the manner in which he litigated these two claims of trial counsel ineffectiveness on direct appeal. These claims are waived because Appellant has failed to develop any argument as to appellate counsel ineffectiveness, or even to identify what actions or inactions of appellate counsel constituted the alleged ineffectiveness on direct appeal. *See* text, *supra,* discussion of Issues 3–5; *Steele,* 961 A.2d at 797.

The remaining sub-issues in Issue 13 are claims of ineffective assistance of appellate counsel for not raising specific claims of trial counsel ineffectiveness on direct appeal, grounded in failure to object to alleged prosecutorial misconduct. As discussed below, none of Appellant's claims of prosecutorial misconduct has any merit; hence, trial counsel was not ineffective for failing to raise these claims, and the derivative claims of appellate counsel ineffectiveness cannot succeed.

■ Our standard for addressing allegations of prosecutorial misconduct is as follows:

It is well settled that, during the penalty phase, where the presumption of innocence no longer applies, a prosecutor is afforded reasonable latitude and may properly comment on the evidence with oratorical flair. Comments by a prosecutor do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination.

\* \* \*

■ [R]emarks made by a prosecutor must be evaluated in the context in which they occur. Furthermore [in

closing argument], the prosecutor may fairly respond to points made in the defense closing.

* * *

[W]ithin reasonable bounds enforced by the trial court, a prosecutor may employ oratorical license and impassioned argument in arguing for the death penalty. While reference to irrelevant matters should be avoided, we note that murder victims are not simply props or irrelevancies in a murder prosecution, and innocuous references to victims and their families are not necessarily prejudicial.

*Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 408–09, 413, 415 (2003) (internal citations and quotation marks omitted); *see also Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898, 917 (2004) ("There is nothing improper in the prosecutor arguing the appropriateness of the death penalty because that is the only issue before the jury at the penalty phase of the trial.") (citation omitted). However, this Court has deemed improper "overly aggressive or highly inappropriate advocacy that could have impermissibly shifted the balance in favor of a death sentence." *Freeman, supra* at 415 (citation and internal quotation marks omitted).

Appellant's first contention of prosecutorial misconduct is that "the prosecutor improperly impeached Mrs. Paddy [Appellant's mother] with a prior **consistent** statement." Appellant's Brief at 92 (emphasis added). To support his novel legal theory, Appellant cites the following excerpts of Mrs. Paddy's cross-examination, which testimony occurred right after Mrs. Paddy testified that Appellant was a loving and caring person:

**Prosecutor:** Mrs. Paddy, you remember telling the jury for the Will Thomas murder the same thing that you just told this jury and apologizing to Little Man Thomas'[s] sisters and relatives. Do you remember that, Mrs. Paddy?

**Mrs. Paddy:** Yes.

**Prosecutor:** It's the same thing, isn't it, Mrs. Paddy?

**Mrs. Paddy:** The same thing, but—

**Prosecutor:** You can say anything you want after you answer my question and I don't mean any disrespect, but do you remember telling the Wilbur Thomas family and the jury that convicted your son of Little Man Thomas'[s] murder the same thing that you're telling this jury?

**Mrs. Paddy:** I believe in telling the truth.

**Prosecutor:** I understand that, but do you remember that?

**Mrs. Paddy:** If it's the way I spoke then, it's true, he's a loving and caring person.

**Prosecutor:** And didn't you say the same[ ] thing, "I'm sorry for the family—"

**Mrs. Paddy:** Yes, that's what I said.

N.T., 12/18/95, at 36.

The prosecutor's line of questioning here does not even approach misconduct. The prosecutor was not, as Appellant asserts, "impeaching" Mrs. Paddy, but merely exploring her bias in favor of Appellant, *i.e.*, her willingness to testify that Appellant was loving and caring even though he had, by the time of her testimony, been convicted of two murders.

Appellant also argues that this line of questioning indirectly informed the jury that he had previously been tried and convicted of another first-degree murder, *i.e.*, that of Wilbur Thomas. This argument is frivolous. Immediately prior to Mrs. Paddy's testimony, the jury had heard testimony as to Appellant's conviction for the murder of Mr. Thomas. *See* N.T., 12/18/95, at 10–13. In fact, there was a stipulation, announced in front of the jury, that Appellant had been convicted of first-degree murder in the killing of Mr. Thomas and sentenced to life imprisonment. *See* N.T., 12/18/95, at 13–14. Appellant's contention that Mrs. Paddy's testimony notified the jury of Appellant's prior murder conviction and sentence simply ignores what really occurred during the penalty phase. Trial counsel had no basis for an objection to the challenged comments by the prosecutor.

■ Next, Appellant contends that the prosecutor's questions to Maudi Fields, the mother of the former boyfriend of

Appellant's sister, were intended to inflame the passions of the jury, resulting in a decision based on emotion. Appellant cites only the following excerpt from Ms. Fields's penalty phase cross-examination, which occurred immediately after Ms. Fields testified that Appellant was honest, meant no harm to anyone, and was a good person:

**Prosecutor:** Would you still have the same opinion that [Appellant] means no harm to anybody, Mrs. Field, if you knew that he shot a girl in the face and blew her brains out and after she was laying [sic] on the ground, shot her five more times ...

\* \* \*

**Prosecutor:** Mrs. Field, you said he meant no harm to any person. Would you say that somebody who shot a girl in the face, blew her brains out and shot her five more times as she lay on the ground in front of her family, would you say that was a good person who meant no harm to anybody, Mrs. Fields?

**Ms. Fields:** Who are you speaking about?

**Prosecutor:** I'm asking a question. Would you say that a person that did that thing that I have just described, would you say that person was a good person who meant no harm to [any]one?

**Ms. Fields:** Yes.

N.T., 12/18/95 at 20–22. (We also note that, contrary to Appellant's implication, defense counsel did object to this line of questioning, but was overruled. *See id.*)

Although this line of questioning was graphic, we cannot conclude that it was so inflammatory as to destroy the ability of the jury to weigh the evidence objectively and arrive at a decision based solely on the evidence. Significantly, the prosecutor's statements were a reiteration of evidence that had been properly admitted in the case. *See Commonwealth v. Douglas,* 558 Pa. 412, 737 A.2d 1188, 1197 (1999) (reiterating that this Court will permit vigorous prosecutorial advocacy so long as "there is a reasonable basis in the record for the [prosecutor's] comments") (citation omitted); *Commonwealth*

*v. Washington,* 549 Pa. 12, 700 A.2d 400, 415–16 (1997) (denying three challenges to the prosecutor's statements in the penalty phase on the grounds that all were reasonable inferences drawn from or reiterations of the evidence presented in the case). With this line of questioning, the prosecutor was vividly, but nonetheless properly, probing the standard by which the witness evaluated Appellant's character, and the trial court properly permitted it.

Next, Appellant contends that the prosecutor's closing argument was improper because it served only to inflame the passions of the jury. The specific comments that Appellant deems improper are the following: (i) asking the jury to show Appellant the same kind of mercy he showed Ms. Whaley; (ii) asking the jury to sentence Appellant to death for the killing of Wilbur "Little Man" Thomas; (iii) belittling Appellant's emotional display of tears; and (iv) arguing that Appellant should be sentenced to death because he posed a future danger. *See* Appellant's Brief at 93–94. All of Appellant's contentions with regard to the prosecutor's closing statement are meritless, and therefore, trial counsel had no basis for an objection.

With regard to sub-issue (i), Appellant cites the following excerpt from the prosecutor's closing argument:

> Are you going to listen to [defense counsel] asking for mercy, have mercy, have mercy, have mercy. No problem. Show him the same mercy he showed Lashawn [Whaley], the same mercy. Each one of you get up and say, death, death, death, death, death, six times. Sure, give him the same mercy, I'm not asking for anymore [sic].

N.T., 12/18/95, at 66.

This Court has consistently held to be permissible those statements by the prosecutor that "ask[ ] the jury to show the defendant the same mercy that he showed his victim." *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 415 (2003); *see also Washington,* 700 A.2d at 415 (holding that the trial court properly admitted a statement by the prosecutor during the penalty phase asking the jury "to give [the defendant] the

same sympathy and mercy that he showed to [the victim] when [the defendant] gunned [the victim] down in cold blood right between the eyes, right in the head"). Based on our ample precedent, we conclude that the comment by the prosecutor in the instant case did not constitute misconduct, and there was no basis for an objection by trial counsel.

■ With regard to sub-issue (ii), Appellant cites the following excerpt and contends that the prosecutor improperly asked the jury to sentence Appellant to death for the murder of Mr. Thomas.

So, when you hear the charge with regard to mitigating and aggravating circumstances, when you do, I suggest that there is only one verdict that you can return, and tough as it may be, you tell [Appellant], Mr. Paddy, you've done too much. We don't have to think because *we know what you did to Little Man Thomas and for just that alone, we should vote for the death penalty.* We certainly know what you did on that day, when you sat with all those children there, so we don't even have to think. We don't have to think. We know about you killing Lashawn Whaley because she was a witness against you in another murder case and we don't even have to think, Mr. Paddy. We vote for death, like you voted for death, except there wasn't [sic] 12 people to hear the evidence. You made that decision on your own, Mr. Paddy, and the 12 of us are now saying that that decision has caused us to vote you your death.

N.T., 12/18/95, at 75–76 (emphasis added).

Appellant focuses only on the emphasized portion of the excerpt above; however, that portion must be considered in context. The prosecutor was summarizing the evidence presented in support of aggravating and mitigating circumstances, and urging the jurors to find that the aggravators outweighed any mitigators. Two aggravating circumstances for which evidence was presented were the murder of a witness and a prior conviction for the murder of Mr. Thomas. It was appropriate for the prosecutor to summarize this evidence and urge the jurors to find that the aggravators

outweighed any mitigators. It is undeniably true that if the jurors found at least one aggravating circumstance and no mitigating circumstances, then the penalty of death was required. We must agree that the prosecutor did not convey the significance of finding an aggravating factor as articulately as he might have. However, when this one potentially offending phrase is taken in the context in which it was delivered, we cannot conclude that it prejudiced Appellant. In the absence of prejudice to Appellant, there cannot be a finding of ineffective assistance.

 In claim (iii), Appellant contends that the prosecutor belittled Appellant's display of emotion by calling it a "stream of tears." Appellant cites two excerpts from the prosecutor's closing argument:

> Here, we're talking about whether we're going to follow the law and the facts and the evidence or whether we're going to follow a stream of tears, because if we're going to follow a stream of tears, there are rivers on this side that you could follow. There are lakes that have been created from the tears of victims. I will not talk about that, but I've got to talk about it in the sense that there are tears cried here by [Appellant], by [Appellant's] family, and I don't mean any disrespect to Mrs. Paddy or Simonia Paddy, but on the other hand, if you are going to weigh the tears, take the Whaleys' tears. Take it every night at 10:00 o'clock, every morning, every Christmas, every birthday, every Thanksgiving, every so often when there is just a flashing thought, "Jeez, that sounds like my little girl and that looks like her." Take those, as well. But, I suggest that you don't do that because that's not the law.

N.T., 12/18/95, at 63.

> Is it arrogance that allows [Appellant] to turn his chair, he sat in this chair while his attorney asked him questions, he cried, he shed tears? There's no tears now, though, right. He sat here and talked to you and smiled and joked and gave you parables and he said, after 1991, after the murder

of Little Man [Thomas], I got religion, I want to teach my children. Hey, I'm sorry, Miss Whaley.

N.T., 12/18/95, at 72.

We cannot conclude that the prosecutor's comments constituted misconduct. The prosecutor made clear that the jury's decision was to be based on the evidence presented in the case and on the law, not on who cried more tears. There is nothing belittling about such a statement. Furthermore, the prosecutor was certainly entitled to question Appellant's sincerity and credibility in delivering his statement to the jury. Trial counsel was not ineffective for failing to object to these comments by the prosecutor.

Finally, in sub-issue (iv), Appellant asserts that the prosecutor argued that Appellant should be put to death because he posed a future danger, and cites the following excerpt to support this assertion.

Where does it all end? He said that in 1991, he got religion after the murder of Little Man Thomas that he hadn't, at that time, been convicted of. Well, did he lose it again in 1993 when he brought his big gun and shot Lashawn [Whaley's] brains out? Yes. Where does it end? Does he have the right to ask you to do something that he didn't[ ] do at least for two cases, listen to him, hear him and his life? Would he have heard Lashawn [Whaley] when she said, "Don't shoot, I want to have children; don't shoot me, I want to take care of my children; don't shoot me, I want to be 21; don't shoot me, I want to hold my mom; don't shoot me, I don't want to see my sister cry?

N.T., 12/18/95, at 71.

Contrary to Appellant's assertions, the prosecutor was not arguing that Appellant posed a future danger, but rather was referring to his past violent conduct. *See* text *supra* (discussion of Issue 7). Trial counsel was not ineffective for failing to object to these comments.

In sum, because none of Appellant's claims of prosecutorial misconduct has any merit, trial counsel was not ineffective for

failing to raise these claims, and the derivative claims of appellate counsel ineffectiveness likewise cannot succeed.

In Appellant's fourteenth issue, he argues that the trial court improperly prevented him from offering relevant mitigation evidence during the penalty hearing when the court did not allow the jury to consider Appellant's protestations of innocence and also removed the jury from the court room when Appellant and his counsel became tearful. Appellant insists that the court barred him from any show of emotion or remorse. Appellant's Brief at 71–73. In addition, Appellant argues that trial counsel was ineffective "[t]o the extent that [she] did not object," [19] and summarily asserts that appellate counsel was ineffective for failing to raise this issue on appeal. Appellant's Brief at 73–74. The PCRA court concluded that the trial court's restriction of emotional displays in no way hampered the presentation of Appellant's testimony or of mitigation evidence. PCRA Court Opinion at 11. We agree.

The purpose of a penalty phase hearing in a capital case is to determine a defendant's sentence—not to relitigate guilt. *Commonwealth v. Rice,* 568 Pa. 182, 795 A.2d 340, 349 (2002) (Opinion Announcing the Judgment of the Court). Evidence may be presented as to any matter that "the court deems relevant and admissible **on the question of the sentence to be imposed.**" *Commonwealth v. Fisher,* 545 Pa. 233, 681 A.2d 130, 147 (1996) (quoting 42 Pa.C.S. § 9711(a)(2)) (emphasis added). A broad spectrum of evidence may be presented as mitigating circumstances, including a "catchall" category that provides for the consideration of "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *Id.* at 147 (quoting 42 Pa.C.S. § 9711(e)(8)). For example, it is well-established that the "demeanor of a defendant, including his apparent remorse, is a proper factor to be considered by a jury in the sentencing phase of a capital case." *Fletcher,* 861 A.2d at 917 (citing *Rice, supra* at 358). Howev-

---

**19.** As Appellant acknowledges, his counsel attempted to object, but she was ordered by the trial court to "sit down and shut up." Appellant's Brief at 73 (citing N.T., 12/18/95, at 38).

er, we have made clear that testimony as to a defendant's guilt is not relevant at the penalty phase and accordingly is properly excluded. *Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704, 715 (1992) (upholding a trial court's refusal to allow the appellant to testify at his penalty phase hearing that he did not murder the victims and indeed had an alibi for the time of the murders).

Based on the above, ample precedent, there is no question that Appellant's assertions of innocence during his penalty phase testimony were irrelevant to the proceeding. Accordingly, this portion of Appellant's testimony was properly excluded by the trial court, and trial counsel had no basis for an objection to the trial court's ruling.

Furthermore, Appellant's assertions that the trial court barred him from showing any emotion or remorse are refuted by the record. Shortly after Appellant began his penalty phase testimony, the court ordered the jury withdrawn and made the following announcement, once the jury had left the courtroom:

**Court:** Let the record note that the jury was ordered withdrawn because we have a rapport here. We have defense counsel crying and we've got the defendant crying at the same time.

N.T., 12/18/95, at 38.

The court then admonished Appellant and his counsel that a court of law should be a professional, not an emotional, proceeding. *Id.* at 39. The court continued as follows:

**Court:** We're professionals. We're mature adults. We have to maintain a dignity and decorum in the courtroom. It's not a funeral dirge. It's a criminal proceeding. You don't decide the case by which side produced the most tears. It's which side produced the evidence and [the jurors] are to weigh the evidence in accordance with the burden of proof.... We use our minds and objectively evaluate things in our courtrooms.

N.T., 12/18/95, at 41.

The jury was brought back into the courtroom after only five minutes, and Appellant resumed his testimony with di-

rections from his counsel to maintain his composure. *Id.* at 43. Appellant then testified in rambling, lengthy fashion, expressing his love for his children, his mother, and his attorney; describing his attempts to do positive things in prison and his struggle within himself; admonishing the jurors to help one another; and apologizing to everybody in the courtroom. *Id.* at 44–51. The court did not constrain Appellant's testimony (except when he tried to proclaim his innocence of the murder, which, as discussed *supra,* was irrelevant to the penalty phase).

This record completely refutes Appellant's contention that the court barred Appellant "from communicating his feelings and sympathies to the jurors who would decide his fate." Appellant's Brief at 72. The court did no such thing. The court simply barred tearful displays by Appellant and his counsel, and maintained decorum appropriate to the gravity of the proceedings. We agree with Appellant that he had a "right to express his heartfelt concerns to his sentencing jury." *Id.* The record shows that Appellant exercised that right. The court did nothing to inhibit Appellant from testifying at length, and the jury had ample time and opportunity to observe his demeanor.

In sum, Appellant's contentions in Issue 14 are either not supported by the record or not consistent with Pennsylvania law. Trial counsel had no basis to object to the exclusion of the testimony at issue, and accordingly Appellant's derivative claims of appellate counsel ineffectiveness must fail.

In Appellant's fifteenth issue, he alleges that trial counsel was ineffective for failing to investigate, develop, and present mitigating evidence at the penalty phase hearing, and that appellate counsel was ineffective for failing to raise this issue on direct appeal.[20] The specific mitigating evidence

**20.** Appellant also inserts a sub-issue of thirteen lines in which he asserts that the trial court's penalty phase instructions to the jury were inadequate. Appellant focuses on the court's instruction to the jury that it should consider all the evidence heard during the guilt phase of the trial. Appellant faults this statement for its lack of a precautionary instruction that testimony surrounding the Panati Playground murders

raised here by Appellant concerns his difficult childhood and the consequences of his childhood experiences on his mental health and psychological development. Appellant contends that counsel's failure to investigate his background and life history prevented the jury from hearing and considering this evidence under the catchall mitigator set forth in 42 Pa.C.S. § 9711(e)(8), which includes as a mitigating circumstance "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." Appellant argues that counsel's deficient performance violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court addressed allegations of ineffective assistance of counsel at the penalty phase of a capital case for failure to present mitigating evidence of life history and background. Relying on *Strickland,* we have observed the following as to counsel's duty with regard to the investigation of potentially mitigating circumstances:

Counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066 [80 L.Ed.2d 674] (1984). Where counsel has made a strategic decision after a thorough investigation of law and facts, it is virtually unchallengeable; strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. *See id.* at 690–91, 104 S.Ct. at

could not be considered evidence of Appellant's guilt. *See* Appellant's Brief at 79.

We can locate no indication in the record that this sub-issue was raised before the PCRA court in any manner at any time, and Appellant fails to provide us with any citation to the contrary from the record. Accordingly, this sub-issue is waived. *See* Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and cannot be raised for the first time on appeal); *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 725 (2000) (applying Pa.R.A.P. 302(a) in the context of the PCRA).

2066. As noted, an evaluation of counsel's performance is highly deferential, and the reasonableness of counsel's decisions cannot be based upon the distorting effects of hindsight. *See id.* at 689, 104 S.Ct. at 2065. Furthermore, reasonableness in this context depends, in critical part, upon the information supplied by the defendant. *See Commonwealth v. Peterkin*, 511 Pa. 299, 319, 513 A.2d 373, 383 (1986) [ ]. Thus, assuming a reasonable investigation, where there is no notice to counsel of particular mitigating evidence, he cannot be held ineffective for failing to pursue it. *See Commonwealth v. Howard*, 553 Pa. 266, 276, 719 A.2d 233, 238 (1998).

*Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 735 (2000); *see also Washington*, 927 A.2d at 615–16 (acknowledging that "counsel's duty is to discover mitigating evidence through his own efforts, including pointed questioning of his client," but declining to conclude that counsel was ineffective for failing to present mitigating evidence relative to an alleged mental infirmity when counsel had no reason to suspect that the appellant might have a mental problem, and he had denied any history of mental illness) (internal citation omitted); *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 45–46 (2002) ("The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel.") (citations omitted); *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 944 (2001) (concluding that counsel could not be found ineffective for failing to present evidence of the appellant's history of abuse where appellant and his family had failed to reveal such history during their consultations with counsel). Finally, we have been careful to note that "different light falls upon counsel's performance depending upon whether [counsel] asked and was not told, or [alternatively, whether counsel] did not ask and therefore was not told." *Basemore, supra* at 735.

In the instant case, Appellant alleges that "trial counsel never conducted any investigation to uncover mitigating evidence to present a case for life [imprisonment,] ... did no investigation into [Appellant's] background and life history[,] ... [and] failed to consult with or present any expert testimony about [Appellant's] background and life history." Appellant's Brief at 75–76. Appellant insists that, if counsel had made a proper investigation, she would have learned that his childhood was marked by instability, parental neglect, and lack of adequate supervision; that he had significant problems in school and interaction with juvenile authorities from an early age; and that he began selling illegal drugs on the street as a teenager. Furthermore, Appellant contends that had counsel presented Appellant's life history to an expert, she would have learned about the effect of this life history on Appellant's emotional and psychological development. Appellant alleges that counsel did not interview a single witness, not even relatives, about his background and life history, and he includes written declarations from his two siblings to support these allegations.[21]

The Commonwealth responds that Appellant has failed to support his claim with an adequate offer of proof, specifically pointing to the fact that Appellant has not included an affidavit from counsel or other documentary support for his assertion that counsel conducted no investigation into Appellant's background. The PCRA court concluded that Appellant had failed to proffer the additional evidence or to identify the witnesses who he believes should have been presented during the penalty phase, and thus was entitled to no relief. PCRA Court Opinion at 11. The PCRA court opinion did not, however, address the adequacy of trial counsel's investigation into potential mitigating circumstances.

21. Appellant also includes a declaration/affidavit from a psychiatrist, but as the Commonwealth points out, this affidavit could not have been considered by the PCRA court because it was dated August 16, 2007, more than two years after Appellant's PCRA petition was dismissed. We cannot consider issues not raised in the PCRA court. See Washington, 927 A.2d at 601 (citing Pa.R.A.P. 302).

The record establishes that defense counsel called five witnesses at Appellant's penalty phase hearing: Maudi Fields, a family friend; Shronda Eubanks, an ex-girlfriend of Appellant; Martha Paddy, Appellant's mother; Simonia Paddy, Appellant's sister; and Appellant himself. N.T., 12/18/95, at 17–37. The testimony of these witnesses was that Appellant was a respectful, honest person who meant no harm, and a loving father, son, and uncle, with whom the witnesses had maintained and would continue to maintain regular contact. *Id.* Only Mrs. Paddy, Appellant's mother, testified about Appellant's childhood and family life, as follows:

> **Mrs. Paddy:** [Appellant has] been a loving and caring child, a supportive child until adult stage, a respectful child, someone to help others.
>
> \* \* \*
>
> **Defense Counsel:** Have you always had a good relationship with [Appellant]?
>
> **Mrs. Paddy:** I have always had a good relationship with my children. They've talked with me. We've laughed together. We cry together. We're a very close family. Whatever goes on, they come to me and we talk about it. [Appellant is] a loving person and a caring person.

N.T., 12/18/95, at 34–35.

Simonia Paddy, Appellant's sister, testified at the penalty phase only that she loved Appellant and that he was a caring and loving uncle to her daughter. N.T., 12/18/95, at 32. However, in a written declaration dated one day prior to the filing of Appellant's objections to the PCRA court's notice of intent to dismiss, Ms. Paddy stated that defense counsel had not discussed her testimony beforehand and had never asked her anything about Appellant's childhood, background, or up-bringing. Simonia Paddy Declaration, dated 4/25/05, ¶ 8.[22]

22. Although Appellant refers to Ms. Paddy's written declaration as an affidavit, it cannot properly be characterized as such because it was not sworn to by the declarant before an officer authorized to administer oaths. *See Steele,* 961 A.2d at 823 (citing 1 Pa.C.S. § 1991). We have held that an unsworn declaration standing alone is insufficient to

Furthermore, Appellant suggests that trial counsel did not collect records of Appellant's life history, such as prison records and his presentence report. Appellant's Brief at 79. In the presentence report, the investigator noted his inability to question Appellant's family, due at least partially to the reluctance of Appellant's mother to be questioned for the report without speaking to counsel. The investigator's messages to Appellant's counsel requesting communication with Appellant's mother went unanswered. *See* Pre–Sentence Report, dated 2/6/96 at 1, 3–4. Based on information from Appellant and from family court records, the report noted that Appellant had had little or no contact with his biological father; had grown up under stable but difficult financial circumstances; had resided mainly at his mother's adequately maintained row home in a neighborhood with some criminal activity; had been a chronic truant; and had undergone psychological profiles as a teenager, pursuant to his involvement with Family Court, which revealed a low normal I.Q., impulsiveness, and at times a quick temper. *Id.* at 1–2.

Based on the evidence presented, Appellant has certainly not met his burden to show that appellate counsel was ineffective for failing to raise the issue of trial counsel ineffectiveness in the investigation of any potentially mitigating circumstances of Appellant's life history. However, because the PCRA court did not hold a hearing, Appellant is required only to show that he has raised "a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *D'Amato,* 856 A.2d at 820; Pa.R.Crim.P. 909.

Upon careful review of the instant circumstances in light of Rule 909, we conclude that Appellant has raised a question of material fact as to whether defense counsel investigated potential mitigating circumstances related to Appellant's life history and background, whether Appellant and his family were forthcoming with such information, whether counsel had a reasonable basis for failing to present such evidence if it

establish ineffective assistance of counsel. *Id.; Dennis,* 950 A.2d at 974 & n. 27.

existed, whether Appellant was prejudiced by the failure to present such evidence as a mitigating factor, and whether appellate counsel was ineffective in failing to raise this issue. Accordingly, we must conclude that the PCRA court erred in dismissing this issue without a hearing, and therefore we remand to the PCRA court for an evidentiary hearing limited to this issue. We stress that the claim before the PCRA court is focused and limited: that appellate counsel was ineffective for failing to raise the question of penalty-phase counsel's ineffectiveness in not investigating, not developing, and not presenting mitigating evidence of Appellant's life history and background. We also stress that the burden rests with Appellant to prove counsel's ineffectiveness. *See Steele*, 961 A.2d at 820 (reviewing in depth and detail the PCRA court's denial of an appellant's claim of penalty-phase counsel ineffectiveness for failing to investigate and present mitigating evidence of life history and mental health).[23]

**23.** Appellant relies primarily on three United States Supreme Court decisions, all of which were decided well after his trial, for his claim of trial counsel ineffectiveness for failure to present life history mitigation evidence. These cases are the following: *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *See* Appellant's Brief at 82 (where Appellant expressly states that his case "is controlled by *Wiggins*.").

As we explained in *Bond*, 819 A.2d at 42, and as Chief Justice Castille further addressed in his concurring opinions in *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638, 674 (2009); *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294, 321–22 (2008); and *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1148, 1152–55 (2008), the cases cited by Appellant did not set forth any new constitutional standards governing claims of ineffective assistance of counsel. The test governing penalty-phase counsel's preparation and performance was—and remains—*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also Commonwealth v. Beasley*, 600 Pa. 458, 967 A.2d 376, 390 (2009) (stating that " . . . the United States Supreme Court has maintained that its opinions in the *Williams* and *Wiggins* line 'made no new law,' but rather, represent an application of clearly established precedent"). The *Strickland* test is materially identical to Pennsylvania's tripartite test for ineffective assistance of counsel. *See Washington*, 927 A.2d at 594 n. 8 (citing *Pierce*, 527 A.2d at 973). Very recently, in a series of opinions, the United States Supreme Court has further clarified that *Strickland* continues to set forth the governing standard for claims of ineffectiveness. *See Bobby v. Van Hook*, —— U.S.

■ In Appellant's sixteenth issue, he merely provides a one-page, catchall claim of general ineffective assistance of all prior counsel, which sets forth **no** challenged acts or omissions and **no** development of argument. *See* Appellant's Brief at 96. Such generalities are not reviewable, and Issue 16 is waived.

## PCRA CLAIMS

In Appellant's seventeenth and final issue, he asserts that his due process rights were violated because the PCRA court failed to allocate funds for investigation, discovery, and expert testimony necessary to prove his PCRA claims, and because the PCRA court denied his request for additional time to allow new counsel to conduct an investigation and hire experts. Appellant's assertions have no merit and are not supported by the record, as they ignore many highly relevant facts and circumstances of his case, as discussed *infra*.

■ We consider first Appellant's claim that he was improperly denied funds for expert and investigative services. Appellant filed a *pro se* "Petition for Investigative and Expert Funds to Aid in the Preparing of an Amended PCRA Petition" (hereinafter "Petition for Funds") on March 15, 2004. Citing his indigency, he claimed that he did not have the resources to "obtain proper investigation and expert services." Petition for

——, ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (*per curiam*) (reiterating that, pursuant to *Strickland*, criminal defendants are entitled to "representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms," and holding that defense counsel's decision not to seek even more mitigating evidence than the substantial amount he had already uncovered from the petitioner's background fell well within the range of professionally reasonable judgments) (internal quotation marks omitted); *Porter v. McCollum*, —— U.S. ——, ——, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009) (*per curiam*) (holding that defense counsel's decision not to investigate mitigating evidence "did not reflect reasonable professional judgment," where counsel had "not even take[n] the first step of interviewing witnesses or requesting records[,] ... ignored pertinent avenues for investigation of which he should have been aware, ... and thus failed to uncover and present any evidence of [the petitioner's] mental health or mental impairment, his family background, or his military service"); *Sears v. Upton*, —— U.S. ——, ——, 130 S.Ct. 3259, 3264–67, 177 L.Ed.2d 1025 (2010) (*per curiam*) (explaining the prejudice inquiry required under *Strickland's* ineffectiveness standard).

Funds at 1. His petition contained only vague assertions as to how the requested funds were to be used. The petition indicated that Appellant could not "determine what claims are all available under the PCRA with respect to trial counsel's failure to properly investigate available defenses unless [Appellant] has sufficient funds and means to properly investigate and develop those claims." *Id.* at 2. He further claimed that preliminary investigation had revealed "significant potential witnesses relevant to guilt phase and penalty phase issues," although no witnesses were identified. *Id.* at 3. In his Petition for Funds, Appellant provided not the slightest information concerning what investigations, what type of expertise or expert services, or what witnesses would be pursued with the requested funds. Nonetheless, he set forth his determination that the following funds were necessary:

$5,000 for investigative funds to interview fact and mitigation witnesses.

$10,000 to obtain experts.

$1,000 for record collection.

*Id.* at 1.

On May 20, 2004, the PCRA court held a hearing concerning, *inter alia,* Appellant's Petition for Funds. Testimony presented at the hearing was only marginally more illuminating than the Petition. Appellant testified that he sought the services of an investigator to interview potential witnesses who were allegedly coerced by police to testify falsely against Appellant at his trial, and to interview witnesses who testified at Appellant's first, but not second trial. N.T., 5/20/04, at 47. Appellant did not give any testimony as to what expert or what type of expert he sought to retain. At the end of this hearing, the court directed Appellant to inform the court as to the name and the professional qualifications of the investigator that Appellant sought to hire, and to explain exactly what the investigator was to investigate. *Id.* at 63–64.

On October 18, 2004, the PCRA court authorized an expenditure of public funds in the amount of $2,500 on behalf of Appellant for investigative services. The record does not

indicate if or how these funds were used. In this appeal, Appellant claims that the allotted $2,500 was "inadequate;" however, he fails to provide any rationale for this claim, except to say that he "was unable to hire any experts in support of his guilt phase claims, or any mental health or other experts in support of his penalty phase claims[, and] he was unable to complete a full investigation of his guilt and penalty claims." Appellant's Brief at 97. Although Appellant insists that his due process rights were violated by the PCRA court's refusal to allocate funds for experts "needed to prove his innocence" and "needed to give him a fair opportunity to prove his claim of prejudice," he fails to provide any insight as to precisely what expert testimony might address such needs and how it might do so. *Id.*

Appellant seems to suggest that the PCRA court was required to grant him the specific amount of public funds he demanded for expert and investigative services, but he cites no legal authority to support such a claim, and we are aware of none. Appellant does attempt to rely on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which addressed the circumstances under which psychiatric assistance must be provided at trial. As this Court has held, *Ake* requires an indigent defendant to be given cost-free access to psychiatric experts only under limited circumstances: (1) in the guilt phase of trial, where the defendant's sanity at the time of the offense is likely to be a significant issue; and (2) in the penalty phase, only to rebut the prosecution's psychiatric evidence of the defendant's future dangerousness. *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 659 (2008); *see also Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 600 (2000) (concluding that the appellant was "not entitled to psychiatric assistance to prove the mental health mitigating circumstances" because future dangerousness was not an issue at trial). We have expressly rejected the proposition that, under *Ake*, all capital defendants are entitled to psychiatric/psychological assistance to determine if there is any relevant mitigation evidence to present in the penalty phase of trial. *Blakeney, supra* at 658, 660.

*Ake* is inapposite to the instant case for several reasons. Appellant sought funds to hire an expert to testify in a PCRA proceeding; as discussed *supra, Ake* applies only to the guilt and penalty phases of trial. *See Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 707 (1998) (rejecting the application of *Ake* to a PCRA appellant's request for public funds to hire an expert to review the evidence presented at trial in light of recent scientific advances). Furthermore, neither Appellant's sanity nor his future dangerousness was or is at issue; accordingly, even if *Ake* were to be considered applicable in the context of the PCRA, Appellant would not be entitled to public funds to retain a psychiatric expert.

The PCRA court, in the proper exercise of its discretion, granted Appellant $2,500 for investigative services. Appellant's claim that due process entitled him to more is supported neither by the facts of the case, nor by the law.

Finally, we turn to Appellant's claim that the PCRA court erred by denying his counsel a continuance for further investigation and possible amendment of his PCRA petition. The decision to grant a continuance is within the sound discretion of the trial court, and we will reverse only if the court has abused its discretion. *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 133 (2008); *see Albrecht,* supra at 708 (affirming a PCRA court's denial of an appellant's request for a continuance after concluding that the PCRA court had not abused its discretion). A number of factors, including Appellant's desire to proceed *pro se* and counsel's late entry into the case, militate against a determination that the PCRA court abused its discretion in the instant case, as discussed *infra.*

Appellant filed a *pro se* PCRA petition on September 20, 2002. Counsel was appointed, but then allowed to withdraw because of a conflict of interest. New counsel was appointed on March 27, 2003. On May 8, 2003, the PCRA court questioned Appellant on his motion to represent himself, and held the motion under advisement; the court also permitted counsel to withdraw, but then on May 20, 2003, appointed another

new counsel. On July 9, 2003, and October 1, 2003, Appellant sought and was granted continuances for further investigation. On October 22, 2003, counsel was permitted to withdraw because of a conflict of interest, and yet another new counsel was appointed on October 30, 2003.

Following a video conference on November 14, 2003, the PCRA court granted Appellant's motion to represent himself and appointed back-up counsel. The court also granted a continuance until February 20, 2004, for preparation of an amended PCRA petition. On February 20, 2004, Appellant sought and was granted an additional ninety days; Appellant finally filed his amended *pro se* PCRA petition on May 20, 2004.

In March 2004, Appellant filed his Petition for Investigative and Expert Funds to Aid in the Preparing of an Amended PCRA Petition, as well as a motion for a discovery hearing. A video hearing was held on these matters on May 20, 2004, at which time the court ordered the Commonwealth to determine if a number of documents existed and, if so, to supply them to Appellant. N.T., 5/20/04, at 61–63. Another video hearing was held on October 18, 2004, at which time the PCRA court rescinded its discovery order of May 20, 2004, and held that Appellant had received all the discovery to which he was entitled. The court also authorized the expenditure of $2,500 on behalf of Appellant for investigative services. Finally, the court gave Appellant a deadline for filing an amended PCRA petition of December 18, 2004, and directed the Commonwealth to respond by February 17, 2005. Appellant filed a 108–page second amended *pro se* PCRA petition on November 17, 2004.

On February 9, 2005, the Commonwealth filed a motion to dismiss Appellant's PCRA petition. At a hearing on February 18, 2005, present defense counsel appeared in court and sought a continuance for further supplementation or amendment of Appellant's PCRA petition. The court denied Appellant's motion for a continuance and informed Appellant of its intent to dismiss his PCRA petition without a hearing. On February 25, 2005, the court sent a formal notice of intent to

dismiss Appellant's PCRA petition without a hearing, and granted Appellant and his new counsel **sixty** days to respond.[24] Appellant and his new counsel filed lengthy objections on April 26, 2005. On May 23, 2005, the court denied Appellant's PCRA petition.

Given these undisputed facts, we cannot conclude that the PCRA court abused its discretion in denying Appellant yet another lengthy continuance to file yet another PCRA petition. Despite the court's strong advice to the contrary, Appellant insisted on representing himself. Over the course of more than two years, he filed three PCRA petitions. Appellant's present counsel did not appear until nearly three months after Appellant had filed his second amended *pro se* PCRA petition, and the court was preparing to announce its intent to dismiss the petition without a hearing. Nonetheless, the PCRA court granted Appellant's new counsel sixty days to respond, which is three times longer than required by Rule 909. Appellant's counsel responded with voluminous objections. Having knowingly, intelligently, and voluntarily decided to proceed *pro se*, Appellant was not entitled to reverse course after several years and delay the resolution of his case further by retaining counsel to file yet another amended PCRA petition. Accordingly, we hold that the PCRA court did not abuse its discretion in denying Appellant's motion for a continuance.

In sum, we affirm the PCRA court's order dismissing Appellant's claims, with the sole exception of one penalty phase claim of ineffective assistance of counsel for failing to investigate and raise mitigation evidence of Appellant's background and life history. We remand to the PCRA court for an evidentiary hearing limited to that claim; for all other claims, we affirm the order of the PCRA court.

Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

___

**24.** Pursuant to Rule 909(B)(2)(b), the defendant has only 20 days to respond to the PCRA court's notice of intent to dismiss his or her petition without a hearing.

Justices BAER and TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion. I write separately to offer my own views of certain points raised in Mr. Justice Saylor's Concurring and Dissenting Opinion.

Justice Saylor reiterates his concern with a "repeated refrain expressed by counsel" that our rules make it impossible for capital post-conviction defense counsel to predict which ineffectiveness claims will receive merits review. Justice Saylor also expresses the view that this Court's approach to merits review has been inconsistent from case to case, and that there is a corresponding internal inconsistency in the Court's approach in this case. Specifically respecting this case, Justice Saylor notes that he cannot discern "any material distinction between the framing of claims of appellate counsel ineffectiveness in several of Appellant's guilt phase claims deemed unworthy of this Court's consideration and the framing of the penalty argument upon which the majority directs a remand." Concurring & Dissenting Op. at 352, 15 A.3d at 478.

–I–

Pleadings prepared or assisted by the Federal Defender have alleged that this Court's approach to claims of appellate counsel ineffectiveness places capital defense counsel and their clients in a quandary as to what is required to secure merits review on collateral attack. But, I do not credit the allegation. Indeed, I believe the purported quandary is overstated, if not feigned, and the complaint strategic. As Justice Saylor acknowledges, I have written before at some length concerning the complex calculations involved when federal counsel involve themselves in state collateral litigation, which might explain the reasons for obvious deficiencies in their trial level plead-

ings and their appellate briefs. *See Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 834–38 (2008) (Castille, C.J., joined by McCaffery, J., concurring). I need not repeat that analysis here.[1]

The settled legal standard for assessing Sixth Amendment claims of ineffective assistance of counsel is found in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and its vast progeny, which includes *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987), the leading Pennsylvania case implementing the *Strickland* standard. There is also a substantial body of decisional law from the High Court specifically addressing what is required to prove a claim of appellate counsel ineffectiveness: *Smith v. Robbins,* 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) and related cases. *See Commonwealth v. May,* 587 Pa. 184, 898 A.2d 559, 577–79 (2006) (Castille, J., joined by Cappy, C.J. and Eakin, J., concurring) (surveying relevant law). *Strickland* claims, whether involving trial counsel or appellate counsel, are not self-proving. As the High Court has very recently reiterated, "[s]urmounting *Strickland's* high bar is never an easy task." *Harrington v. Richter,* —— U.S. ——, ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (quoting *Padilla v. Kentucky,* 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010)). The Court also reminded that, because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and

---

1. Significantly, since *Steele* was decided, the U.S. Supreme Court has issued unanimous decisions in two federal *habeas corpus* cases involving state prisoners, including *Beard v. Kindler,* 558 U.S. ——, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009), a Pennsylvania capital case, which should significantly diminish the incentive for counsel to try to sow inconsistencies and confusion in state court procedural rulings, in an effort to lay the groundwork for a later federal habeas claim that state court procedural defaults should not be honored. "In a recent decision, *Beard v. Kindler,* 558 U.S. ——, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009), this Court clarified that a state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default." *Walker v. Martin,* —— U.S. ——, ——, 131 S.Ct. 1120, 1125, 179 L.Ed.2d 62 (2011). The *Walker* decision built upon and significantly expanded *Kindler,* making it clear that a state procedural default rule need not be invoked in every case in order for the rule to be deemed adequate.

forfeiture ... the *Strickland* standard must be applied with scrupulous care." *Id.* Otherwise, the inquiry can "threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.*

PCRA[2] appeal counsel for a petitioner who would like to ensure so-called "merits" review of an appellate *Strickland* claim must merely attend to the Sixth Amendment burden imposed by *Strickland* and *Smith v. Robbins.* A failure to brief a necessary element of any legal claim, civil or criminal, risks defeat of the claim. Concerning what is required to secure relief on an appellate counsel *Strickland* claim (whether stand-alone or layered), it remains my considered judgment, after many years of reviewing these briefs, that the failure to develop arguments in conformity with federal substantive command is not a function of this Court's supposedly changing or elusive standards, but is a product of a "fully realized capital collateral litigation strategy, one whose primary concern is with laying the groundwork for anticipated federal habeas corpus relief" on other grounds. *Steele,* 961 A.2d at 836 (Castille, C.J., concurring).

Finally, although the Majority employs the term "waiver" to describe its disposition of the insufficiently developed stand-alone appellate counsel ineffectiveness claims that are briefed here, I do not believe that this manner of disposition operates to deny merits review; rather, it is a form of merits review. As I explained ten years ago, in the "merits analysis" of a *Strickland* claim, "it is clear that appellant's failure to forward relevant argumentation as to each necessary 'individual facet' of the *Strickland* standard dooms his boilerplate claims to failure." *Commonwealth v. Lambert,* 568 Pa. 346, 797 A.2d 232, 243 (2001) (Opinion Announcing Judgment of Court ("OAJC")). The OAJC elaborated: "Here, appellant's arguments, at best, could be construed as attempting to establish the arguable merit of his underlying waived claims while he then simply assumes that the failure to pursue such claims automatically renders counsel ineffective. This *per se* approach to ineffectiveness fails to establish **either** the perform-

2. Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*

ance prong (*i.e.*, lack of reasonable basis) or the prejudice prong of the *Strickland* test. Accordingly, the claims fail on the merits." *Id.* at 243 n. 9.

## –II–

Turning to Justice Saylor's expression of concern respecting uneven treatment of similarly briefed claims, my own view follows.

## –A–

The failure to brief necessary *Strickland* elements in a meaningful fashion unfortunately is not an uncommon phenomenon, and I realize that different cases have approached such claims in varying fashion. Especially in cases involving the Federal Defender, the briefing failures are usually of a kind with the non-development here—*i.e.*, the brief identifies and outlines a defaulted claim and then simply declares that direct appeal counsel lacked a reasonable basis for failing to pursue the claim, and that prejudice resulted. In some instances, the Court has passed over the obvious briefing deficiency and rejected such claims because there was no merit in the underlying argument; but, in other cases, we have invoked the lack of development as a sufficient ground in itself to reject claims. In an ideal world, I suppose we could strive to treat all such claims in the same fashion in all cases. This would make sense given that our cases deeming undeveloped claims to be waived are not confined to criminal matters, or to *Strickland* claims; it is a rule of general applicability. *See* Pa.R.A.P. 2119; *see, e.g., Purple Orchid, Inc. v. Pa. State Police,* 572 Pa. 171, 813 A.2d 801, 804 (2002) (issue waived by failure to address and develop in appellate brief).

But, it is unrealistic to expect the various members of the Court to approach all cases, and all issues, in the same fashion, and the capital collateral appeals are particularly vexing—in large part because of strategic briefing decisions, such as I described in my concurrence in *Steele.* The prolix filings in many of the capital collateral appeals—as here, where appel-

lant poses seventeen numbered claims and innumerable sub-claims—are designed to be burdensome if for no other reason than to create delay. The more burdensome the brief, the more likely it is that efficiency of disposition will dictate that the failure to develop a claim in the brief will be chosen as the basis for disposition. There is nothing wrong with such an approach. Indeed, as Justice Ginsburg, writing for the unanimous Court in *Walker v. Martin,* explained:

> We see no reason to reject California's [state *habeas corpus* ] time bar simply because a court may opt to bypass the [timeliness] assessment and summarily dismiss a petition on the merits, if that is the easier path. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 697 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984) ("[A] court need not determine whether counsel's performance was deficient . . . [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . ."); *cf. Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 585 [119 S.Ct. 1563, 143 L.Ed.2d 760] (1999) ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits.").
> —— U.S. ——, ——, 131 S.Ct. 1120, 1129, 179 L.Ed.2d 62 (2011).

So long as the multiple available grounds for **rejecting** an ineffectiveness claim are legitimate in their own right, the Court is not bound to prefer one form of appropriate disposition over another; there is discretion in the assigned author to approach the particular assignment in what seems to be the most efficient manner for that case; and the assigned Justice's instinct warrants a measure of deference.[3]

Indeed, I addressed this point at some length ten years ago:

> [L]ike any legal claim, an ineffectiveness claim may fail on the merits for a number of independently valid reasons. So long as there is no jurisdictional question (*i.e.,* the PCRA petition was timely filed), a court rejecting a particular PCRA claim is not required to prefer one proper ground of

---

3. On the latter point, *see, e.g., Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1148 (2008) (Castille, C.J., joined by McCaffery, J., concurring) (explaining reasons for joining remand).

disposition over another. In [*Commonwealth v.*] *Marrero,* [561 Pa. 100, 748 A.2d 202 (2000),] this Court rejected layered, boilerplate claims of appellate counsel ineffectiveness because it deemed the underlying claims of counsel ineffectiveness to be meritless, rather than focusing on the failure of the appellant to address other, equally necessary elements of the ineffectiveness standards. I view the *Marrero* disposition as an available and appropriate, but not a required and exclusive, approach to the merits of a reviewable ineffectiveness claim. This is so because both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first.

The more difficult question is what sort of a message this Court sends to PCRA petitioners and practitioners by choosing, or preferring, one available method of disposition over another. Appellant's arguments in this case, like the non-argument forwarded in *Marrero,* at best may be construed as attempting to establish the arguable merit of her underlying waived claims while she then simply assumes that the failure to pursue such claims renders counsel *per se* ineffective. This *per se* approach to ineffectiveness fails to establish **either** the performance prong (*i.e.,* lack of reasonable basis) or the prejudice prong of the *Strickland* test. Accordingly, the claims must, inevitably, fail. The advantage of discussing the fatal deficiency in such an argument on the merits is that it reinforces for PCRA petitioners and practitioners alike the necessity that they address **all** necessary substantive elements of a claim in order to actually obtain relief on it, as opposed to the decidedly Pyrrhic victory that will result when a claim is undeveloped and survives waiver only as a matter of this Court's grace. At least in cases where the substantive deficiency in the argument is pervasive, as in this case, I think we better serve by focusing on those substantive deficiencies, as the lead opinion has done here.

*Commonwealth v. Rivers,* 567 Pa. 239, 786 A.2d 923, 939 (2001) (Castille, J., concurring) (citations omitted; emphases original). The above-described preference did not represent a majority view and I, like other members of the Court, have since authored and joined opinions which have afforded some capital petitioners more than their due, by passing upon *Strickland* claims "on the merits," despite the lack of necessary development in the brief.

Finally, along these lines, I would reiterate that the U.S. Supreme Court has recently reaffirmed that state procedural default rules involving discretion are entitled to deference on federal *habeas corpus* review, at least so long as they are neither designed, nor operate, to discriminate against federal claims or claimants. *Walker,* —— U.S. at ——, 131 S.Ct. at 1130. To the extent that this Court has afforded some petitioners more than their due in rejecting *Strickland* claims "on the merits" that we could just as easily and properly have rejected due to the failure to address necessary *Strickland* elements, we certainly have not discriminated against federal claims or claimants as a class. But, having said that, and cognizant of the litigation incentives for federal counsel to mischaracterize and demean our approach in capital cases, perhaps the Court should consider the position I outlined in *Rivers,* and always invoke *Strickland* briefing inadequacies where appropriate, and thereby reduce the incentive. *Rivers,* 786 A.2d at 937–39 (Castille, J., concurring); *see Gibson,* 951 A.2d at 1150 (Castille, C.J., joined by McCaffery, J., concurring) ("The threat of dismissive federal responses to flexible state procedural rules can lead to state legislatures and courts adopting ever-more inflexible rules."); *accord Walker,* —— U.S. at ——, 131 S.Ct. at 1130.

## –B–

The above observations speak to decisional options when an ineffectiveness claim fails. Obviously, different jurisprudential imperatives would be implicated if the Court were to grant relief (either outright, or in the form of a remand for an ineffectiveness hearing) on one insufficiently developed *Strick-*

*land* claim, while deeming waived other *Strickland* claims suffering from an identical lack of development in the briefing. But, in my view, that circumstance is not presented here. The claims that the Majority deems waived for lack of development in briefing are stand-alone claims of appellate counsel ineffectiveness, while the single claim upon which the Majority remands is a layered claim (deriving from the failure of trial counsel to develop and present a stronger mitigation case at the penalty phase). In this layered claim, the underlying claim of trial counsel ineffectiveness is developed at some length in appellant's brief, while the derivative claim concerning appellate counsel is, as Justice Saylor notes, developed in as perfunctory a fashion as are appellant's stand-alone claims concerning appellate counsel. But, treating layered and stand-alone claims "differently" in this instance is appropriate, in my judgment, given this Court's decision in *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003).

Layered *Strickland* claims are different from stand-alone claims of appellate counsel ineffectiveness. With a stand-alone claim, the entire focus is upon the performance of appellate counsel, which triggers the special concerns outlined in cases such as *Smith v. Robbins, supra.* To prevail, the PCRA petitioner must show exactly how appellate counsel was ineffective, by offering additional evidence or controlling authority, missed by direct appeal counsel, that would have changed the appeal outcome; or by specifically alleging the winning claim or distinct legal theory that appellate counsel failed to recognize; and then by showing how the appeal, as pursued, was incompetent by comparison. In this case, with respect to all stand-alone claims of appellate counsel ineffectiveness, appellant's brief defaults to claiming that direct appeal counsel was ineffective for failing to "fully develop" claims on direct appeal. Boilerplate arguments such as these, which fail even to address those concerns that are peculiar to appellate advocacy, are properly deemed non-starters.

The treatment of layered *Strickland* claims, however, can be different in light of the transitional paradigm for that narrow sub-class of claims outlined in *Commonwealth v. McGill.*

Where, as here, the deficiency in briefing the appellate counsel aspect of a layered claim replicates a deficiency in pleading that aspect of the claim before the PCRA court, and the PCRA court did not identify the pleading deficiency as the grounds for rejecting the claim, and thereby allow for amendment to address the deficiency, *McGill* teaches that we should pass through the deficiently developed appellate claim and assess the merits of the underlying, "nested" claim of trial counsel ineffectiveness. If that underlying claim has merit, we will remand; if it does not, we will reject the layered claim. *McGill*, 832 A.2d at 1023; *Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 656 (2003). This remand jurisprudence remains viable today, in instances where an opportunity to amend PCRA pleadings concerning layered *Strickland* claims was not afforded. The Majority acknowledges and applies this jurisprudence by reviewing appellant's layered claims by passing through to the merits of the underlying claims of trial counsel ineffectiveness.

I realize that appellant's stand-alone claims of appellate counsel ineffectiveness were not rejected by the PCRA court on grounds that they were insufficiently developed, and thus appellant was not afforded an opportunity to amend his pleadings below; I realize that appellant's obviously insufficient merits briefing of those claims before this Court mirrors his perfunctory pleadings below; and I realize that appellant's undeveloped arguments respecting these claims are little different from his manner of arguing the appellate counsel aspect of his layered *Strickland* claims. But, this Court has not adopted a *McGill*-like pass-through mechanism for stand-alone claims. *McGill* was adopted as a response to perceived confusion with respect to what is required to secure merits review in layered ineffectiveness cases. *See McGill*, 832 A.2d at 1021 ("The manner in which this construct [the *Strickland/Pierce* test] operates when a litigant is challenging the effectiveness of his or her immediate prior counsel is well settled. Causing uncertainty among the bench and bar, however, is how to preserve and prove a PCRA claim challenging the effectiveness of counsel other than immediate prior coun-

sel."); *accord Commonwealth v. Daniels,* 600 Pa. 1, 963 A.2d 409, 419–20 (2009). Nor do I think we should adopt a special rule absolving PCRA petitioners of the necessity to properly develop stand-alone claims of appellate counsel ineffectiveness; the requirements are federally commanded, well-settled, and easily found. And, finally, I believe that it is appropriate to cite to the lack of development of a stand-alone claim in the appellate briefing as the ground for disposition, even if a similar lack of development was not the ground cited by the PCRA court for rejecting the claim.

Justice EAKIN, concurring.

I reiterate that counsel's performance, particularly regarding mitigating evidence, should be critiqued according to the law existing at the time of trial, not according to standards announced thereafter. *See, e.g., Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 671 (2008) (Eakin, J., concurring and dissenting); *Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1155 (2008) (Eakin, J., concurring and dissenting); *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775, 795–96 (2006) (Castille, J., dissenting). "Any other standard would require counsel to predict changes in the law and turn representation into prognostication." *Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294, 324 (2008) (Eakin, J., concurring).

The United States Supreme Court held the United States Court of Appeals for the Sixth Circuit erred in applying the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases to representation which occurred in the 1980s, without considering whether those guidelines reflect "the prevailing professional practice at the time of the trial . . . ." *Bobby v. Van Hook,* —— U.S. ——, 130 S.Ct. 13, 17, 175 L.Ed.2d 255 (2009) (*per curiam*). The Court further noted,

The Sixth Amendment entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." That standard is necessarily a general one. Restatements of

professional standards can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Id.,* at 16 (citations omitted). Accordingly, the United States Supreme Court has determined the professional standards guiding the ineffectiveness inquiry are those existing "when the representation took place." *Id.* The Court has recently reiterated that "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (U.S.2011). In *Harrington,* the Court faulted the United States Court of Appeals for the Ninth Circuit for "fail[ing] to 'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsels perspective at the time.'" *Id.* (quoting *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). This Court should do the same.

In all other respects, I join the majority opinion.

Justice SAYLOR, concurring and dissenting.

Similar to *Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786 (2008), the majority finds a substantial portion of Appellant's guilt-phase claims to be waived for failure to file an adequate brief.

I am sensitive to the concern, expressed by Justices in other settings, that some of the testing of the limits of this Court's rules governing the presentation of written arguments may be strategically motivated. *See, e.g., id.* at 421–28, 961 A.2d at 834–38 (Castille, C.J., concurring). I also remain cognizant, however, of a repeated refrain expressed by counsel that the character and application of our rules continues to shift and change, such that it is impossible to predict which arguments will garner this Court's review and which will be deemed unworthy of consideration. *See, e.g., id.* at 429, 961 A.2d at 838–39 (Saylor, J., dissenting) (quoting the contention presented on behalf of a capital defendant that "[i]t is respectfully

submitted that this Court's recent opinions regarding pleading and proof in capital PCRA cases are confusing, inconsistent and constantly shifting."). Here, for example, I cannot discern any material distinction between the framing of claims of appellate counsel ineffectiveness in several of Appellant's guilt-phase claims deemed unworthy of this Court's consideration and the framing of the penalty argument upon which the majority directs a remand.[1] In point of fact, it seems to me that none of Appellant's layered claims meets the Court's briefing requirements as applied to most of the claims in this case and in *Steele*.

Two conclusions flow readily from this observation if it is accepted as a premise. First, the application of the briefing requirements is being administered unevenly (since some non-compliant claims are being reviewed and some are not, without any actual or apparent explanation for the differential treatment). I believe this phenomenon is now occurring not only within the confines of individual cases, but also, on an inter-case basis. Second, since appellate post-conviction counsel in this and many other cases cannot seem to raise layered claims meeting this Court's requirements, to the degree those requirements are reasonable and well-established, counsel are patently ineffective. This observation seems particularly pro-

1. All of Appellant's claims of ineffectiveness on the part of his appellate counsel tend to be stated in a relatively summary fashion, relying tacitly on the development of the asserted strength and apparentness of the underlying claims to demonstrate deficient stewardship at the appellate level in the failure to appropriately advance them.

For example, the specific development of the reasonable basis prong of the claim of appellate counsel ineffectiveness in each of the claims the majority deems unworthy of merits review is as follows: "[A]ppellate counsel could have had no reasonable basis for his failure to include the claim of trial counsel's ineffectiveness in Appellant's appeal. Appellant was, and is, prepared to prove this at a hearing."; "[A]ppellate counsel could have had no reasonable basis for failing to raise all of the foregoing arguments; Appellant is entitled to a hearing on the question."; "As these claims are meritorious, counsel could have had no reasonable strategic basis for failing to raise these claims." Brief for Appellant at 26, 37, 52. These passages are materially identical to the discussion of the reasonable basis prong in the single claim the majority finds supports further merits review. *See id.* at 85 ("Counsel could have had no reasonable basis for failing to include this claim and for failing to investigate Appellant's background.").

blematic, since a majority of the Court now appears to be suggesting that there effectively can be no state-level redress for such deficient stewardship. *See Commonwealth v. Pitts,* 603 Pa. 1, 9–10 n. 4, 981 A.2d 875, 880 n. 4 (2009).

In summary, I support the remand to consider the penalty matter, but, with regard to Appellant's other claims (and capital claims in general), I believe this Court should err on the side of affording merits review, rather than foreclosing such review.